**FIAT MOTORS OF NORTH AMERICA, INC., Plaintiff,**

**v.**

**MELLON BANK, N.A., Defendant.**

**Civ. A. No. 83–1571.**

United States District Court, W.D. Pennsylvania.

Aug. 28, 1986.

W. McCook Miller, Jr., Pittsburgh, Pa., for plaintiff.

Mark F. McKenna, Jr., Pittsburgh, Pa., for defendant.

## OPINION

DIAMOND, District Judge.

Plaintiff brought this action to recover damages for the alleged breach by the defendant of a Wholesale Financing Commitment (hereafter sometimes, "WFC"). The WFC was a contract, more specifically, a letter of credit, under which the defendant agreed to pay the plaintiff for invoices and drafts issued in connection with the delivery by plaintiff of Fiat motor vehicles to one of its dealers, Bob Raymond Imports, Inc. (hereafter sometimes, "BRI"). Following a bench trial, the court makes the following findings of fact and conclusions of law.

### Findings of Fact

1. Plaintiff, Fiat Motors of North America (hereafter sometimes, "Fiat" or "Fiat Motors") is a business corporation, which at the time the complaint was filed was incorporated under the laws of the state of New York. At all times material herein, plaintiff's principal place of business was located in Hasbrouck Heights, New Jersey

(Plaintiff's proposed findings of fact ("PPFF") No. 1).[1]

2. Defendant, Mellon Bank, N.A. (hereafter sometimes, "Mellon" or "Mellon Bank"), is a national banking association not having its registered office or a principal place of business within the State of New York or the State of New Jersey. (PPFF No. 2).

3. Mellon Bank has its principal office and place of business within the district of the United States District Court for the Western District of Pennsylvania. (PPFF No. 3).

4. The amount in controversy is this action exceeds the sum or value of Ten Thousand Dollars ($10,000.00), exclusive of interest and costs. (PPFF No. 4)

5. Fiat Motors previously was known as Fiat-Roosevelt Motors, Inc. and Fiat Distributors, Inc. (PPFF No. 5).

6. At all times material hereto, Fiat Motors was an importer into and distributor of Fiat motor vehicles within the United States of America. (PPFF No. 6).

7. At all times material hereto, BRI was a car dealer engaged in the sale and servicing of Fiat motor vehicles. (PPFF No. 7).

8. By agreement dated November 19, 1975, Fiat Distributors, Inc. and BRI entered into a written Dealer Sales and Service Agreement (the "Dealer Agreement").[2] (Plaintiff's Exhibit No. 5).[3]

9. At the time Fiat Motors entered into the Dealer Agreement, Fiat Motors relied on, *inter alia,* a Wholesale Financing Commitment previously issued by Defendant, Mellon Bank (Exhibit No. 1).

10. Mellon Bank had security agreements with Bob Raymond Imports and filed financing statements reflecting its security interest (Exhibits No. 25 and 25A).

11. On October 2, 1978, Mellon Bank executed another Wholesale Financing Commitment (Exhibit No. 2) for the benefit of plaintiff, Fiat Motors. This WFC provided in part that:

> In consideration of shipments or deliveries of Fiat motor vehicles which may hereafter be made by you pursuant to written orders of the dealer designated above, [BRI] we hereby agree (a) to pay you the total amounts shown on invoices covering such shipments and deliveries ... upon presentation by you to us of such invoices, or (b) to pay promptly at par, drafts drawn on us for the total amount of such invoices, provided, however, (i) that our obligation hereunder shall not exceed *$50,000.00* aggregate amount of invoices or drafts presented in any one day....

12. Mellon's line of credit to Bob Raymond Imports under the WFC was Two Hundred Fifty Thousand Dollars ($250,000.) (Exhibit No. 3).

13. On or about January 18, 1977, Mellon Bank executed a "Waiver of Certificate of Origin" which it presented to Fiat Motors wherein Mellon requested that Fiat "send directly to subject dealer [BRI] the Certificate of Origin for the Fiat automobiles that are purchased from you until otherwise notified in writing by us." (Exhibit No. 4).

13-A. This waiver remained in effect during all times material in this case, and never was withdrawn or rescinded by Mellon Bank.

14. From October of 1978 through 1981, plaintiff shipped over a hundred cars to BRI in reliance, at least in part, on the 1978 WFC.

15. In April 1981, BRI agreed to participate in Fiat's so-called "1981 Spring Incentive Program" (hereafter sometimes, the "Program" or the "1981 Program") and

1. Defendant has accepted plaintiff's proposed findings of fact Nos. 1–7.

2. Although for convenience the wording of many of the findings of fact from No. 8 to the end tracks that of one of the plaintiff's or defendant's proposed findings of fact, the finding itself is the result of the court's independent evaluation of the evidence and record in this case.

3. Hereafter numbered exhibits refer to plaintiff's exhibits and lettered exhibits refer to defendant's exhibits.

agreed to purchase fifty of plaintiff's cars between April and July 1981. (Exhibit Nos. 8 and 8A).

16. Mellon was not advised of Fiat's 1981 Spring Incentive Program or of its terms and conditions until on or about April 30, 1981, when Mellon received the first group of invoices for Fiat vehicles ordered by BRI under the Program.

17. Among those vehicles delivered to Bob Raymond Imports pursuant to the 1981 Program were twelve Fiat automobiles identified by serial number, all of which were shipped in 1981.

18. On or about the date of shipment of these motor vehicles, Fiat Motors issued invoices and sight drafts pertaining to the respective vehicles, and those sight drafts and invoices were mailed to and received by defendant, Mellon Bank, (Exhibit Nos. 11A–L).

19. Those invoices are as follows:

| Model/Serial Number | Invoice Amount | Invoice Date | Invoice Exhibit No. |
|---|---|---|---|
| 1981–X19–00137416 | $8,374.00 | 4/30/81 | 11–A |
| 1981–124–00175539 | $8,687.00 | 4/30/81 | 11–B |
| 1981–138–02524948 | $5,695.00 | 5/07/81 | 11–C |
| 1981–138–02537465 | $5,695.00 | 5/07/81 | 11–C |
| 1981–X19–08138748 | $8,524.00 | 4/30/81 | 11–E |
| 1981–X19–08141830 | $8,524.00 | 4/30/81 | 11–F |
| 1981–124–08180679 | $9,230.00 | 4/30/81 | 11–G |
| 1981–124–08182669 | $9,230.00 | 7/29/81 | 11–H |
| 1981–124–08183551 | $9,230.00 | 7/29/81 | 11–I |
| 1981–124–08183608 | $9,466.00 | 7/29/81 | 11–J |
| 1981–124–08184021 | $9,037.00 | 4/30/81 | 11–K |
| 1981–124–08184627 | $9,466.00 | 4/30/81 | 11–L |

20. At the time the respective invoices and sight drafts were sent by Fiat Motors Mellon Bank, the respective Fiat motor vehicles were shipped to BRI. (Exhibit Nos. 11A–L and 15A–L).

21. BRI received the twelve vehicles in question and later sold or otherwise transferred them. (Exhibit No. 15A–L).

22. On May 7, 1981, and on either May 11 or May 12, 1981, defendant received a number of invoices and corresponding drafts from plaintiff for new Fiat vehicles delivered to BRI on its order under the Spring 1981 Program. The invoices and drafts received by Mellon on May 7, 1981, totalled in excess of $50,000, and those received on either May 11 or 12, 1981, totalled $162,318. All of the invoices and drafts sent by plaintiff to defendant under the Spring 1981 Program up to May 15, 1981, were returned to the plaintiff by the defendant in its letters of May 8, 12 and 15, 1981, (Exhibits D, E, F), and defendant paid for none of those invoices and honored none of those drafts.

23. Fiat Motors received a Retail Delivery Receipt ("RDR") for each of the twelve vehicles here in suit, which indicated that the vehicles had been sold by BRI. As to several of the twelve vehicles here in question, this triggered the payment-due provision of the delayed payment instruction of the Spring 1981 Incentive Program received by Mellon Bank (Exhibit No. 12), however, except as set forth in finding 26, *supra,* Fiat Motors never received payment from BRI or from Mellon Bank for any of the twelve cars (Exhibit No. 15A–L).

24–25. The twelve vehicles and their respective invoice and retail sale dates and the payment-due dates per the delayed payment instructions (Exhibit No. 12) are:

| Invoice Exhibit No. (Finding 19, supra) | Invoice Date (Finding 19, supra) | Retail Sale Certificate Exhibit No. | Retail Sale Date | Payment Due Date |
|---|---|---|---|---|
| 11–A | 4/30/81 | 15–A | 10/8/81 | 8/30/81 |
| 11–B | 4/30/81 | 15–B | 8/04/81 | 8/04/81 |
| 11–C | 5/07/81 | 15–C | 8/19/81 | 8/19/81 |
| 11–D | 5/07/81 | 15–D | 8/31/81 | 8/31/81 |
| 11–E | 4/30/81 | 15–E | 11/10/81 | 8/30/81 |
| 11–F | 4/30/81 | 15–F | 8/18/81 | 8/18/81 |
| 11–G | 4/30/81 | 15–G | 8/13/81 | 8/13/81 |
| 11–H | 7/29/81 | 15–H | 11/03/81 | 11/03/81 |
| 11–I | 7/29/81 | 15–I | 8/05/81 | 8/05/81 |
| 11–J | 7/29/81 | 15–J | 8/24/81 | 8/24/81 |
| 11–K | 4/30/81 | 15–K | 9/14/81 | 8/30/81 |
| 11–L | 4/30/81 | 15–L | 11/10/81 | 8/30/81 |

26. In November, 1981, plaintiff received Ten Thousand Dollars ($10,000.) from BRI, which plaintiff credited to a BRI parts account. In fact this $10,000. was paid by BRI for application to its account with plaintiff for autos delivered by it under the Spring 1981 Program, and should have been applied to that account.

27. The WFC was never cancelled or suspended by Mellon and remained in effect during all times material in this case.

(PPFF No. 26, defendant's counter-proposed findings of fact 26, and testimony of Joseph O. Scrip and Bart Klim).

28. At least two other Fiat car dealers in the Pittsburgh, Pennsylvania, area participated in the 1981 Spring Incentive Program. Those dealers had floor plan lines of credit with Mellon Bank, N.A., identical in all material respects to the 1978 Wholesale Financing Commitment here in suit. In those cases, however, all Fiat Motors drafts presented by plaintiff were honored by the defendant.

## Discussion

Pursuant to the Spring Incentive Program of 1981, Bob Raymond Imports ordered approximately forty-two Fiat vehicles from the plaintiff, which were delivered to BRI at various times commencing in April 1981, and extending for several months thereafter. Included among those vehicles were twelve which BRI sold in the regular course of business but for which it failed to pay Fiat.

The dispute in this case concerns those 12 vehicles. Fiat contends that Mellon had a contractual obligation under its Wholesale Financing Commitment to pay Fiat the invoice prices of those vehicles. Mellon, on the other hand, advances several reasons why it was not obliged to pay Fiat for any of the vehicles delivered to BRI under the Spring 1981 Program.

Initially, Mellon contends that when it received the first batch of invoices for vehicles delivered by Fiat to BRI under the Spring 1981 Program Mellon promptly notified Fiat, first by phone and then by letters, that Mellon would not participate in the Spring 1981 Program. Mellon contends that it returned the invoices unpaid because Fiat had attempted to modify the terms and conditions of the WFC, which Mellon contends was actually a letter of credit, by providing that Mellon could not pay the invoices or drafts for 120 days or when the vehicle was sold by BRI, whichever came first, unless BRI requested Mellon to pay sooner. This relieved Mellon of its obligation under the WFC–letter of credit, Mel-

lon maintains, because it was a material modification of that document, which had provided for the *immediate* payment of invoices and sight drafts for vehicles delivered by Fiat to BRI.

In addition, Mellon argues that it advised Fiat that Mellon had received invoices in excess of the $50,000. per diem limit provided for in the WFC and that, therefore, Mellon was relieved of *any* contractual duty to pay for *any* of the invoices—not just those in excess of the $50,000. per diem limit.

The court accepts Mellon's contention that the WFC was a letter of credit within the meaning of the Uniform Commercial Code Article V, §§ 102 and 103, now 13 Pa.C.S.A. §§ 5102(a)(1) and 5103(a). The WFC not only meets the definition of a letter of credit appearing in those sections, but, in addition, virtually is identical to the document which the court in *Toyota Industrial Trucks, U.S.A., Inc. v. Citizens Bank of Evans City*, 611 F.2d 465 (3d Cir.1979), held to be a letter of credit. However, the court rejects the defendant's argument that it was relieved of its obligation under the WFC because the plaintiff modified the terms and conditions precedent to the defendant's obligation thereunder to honor drafts and invoices for automobiles shipped by plaintiff to BRI.

The WFC (Exhibit No. 2) provides on the front side above the signature line of the defendant that:

> In consideration of shipments or deliveries of Fiat motor vehicles which may hereafter be made by you pursuant to written orders of the dealer designated above, we hereby agree (a) to pay you the total amounts shown on invoices covering such shipments and deliveries (such amounts to include, but not to be limited to, the dealer's prices for such motor vehicles and accessories and equipment installed thereon or sold in connection therewith and charges for transportation, handling and taxes) upon presentation by you to us of such invoices, or (b) to pay promptly, at par, drafts drawn on us for the total amount of such invoices;

provided, however, (i) that our obligation hereunder shall not exceed $50,000.00 aggregate amount of invoices or drafts presented in any one day (such amount not to be anticipated or accumulative and any portion available but unused during any one day to become automatically cancelled at the end of each day) and (ii) that our obligation hereunder shall be limited to the type of commitment checked below: ....

The WFC further provides that the commitment is "not limited as to the number of Fiat motor vehicles ordered by the dealer or as to time" and then immediately above the signature line executed by the defendant appears the following paragraph:

Our obligation hereunder may be cancelled by us at any time by giving you our written notice of cancellation, provided, however, that no such cancellation shall be effective with respect to motor vehicles shipped or delivered by you to the dealer or his designated agent up to and including the second business day following receipt by you of such written notice of cancellation. The further *explanation* on the reverse side of this form has been noted by us. (emphasis added).

The reverse side to which reference is made in the final paragraph quoted above is entitled "Fiat-Roosevelt Motors, Inc. Policy and Drafting Procedure". This is followed by ten separately numbered paragraphs, which we reproduce in footnote 4 below.[4]

The defendant contends that paragraphs 7, 8, and 9, particularly paragraph 9, are incorporated into the *commitment* portion of the WFC, so that the defendant was obliged to pay plaintiff's drafts immediately. In other words, defendant argues that in effect it had agreed to pay immediately on receipt of the drafts. This was what the

4. Fiat-Roosevelt Motors, Inc., Policy and Drafting Procedure:

1. Fiat automobiles are shipped to dealers pursuant to dealers' written orders.

2. Upon shipment or delivery to the ordering dealer or his designated agent, a sight draft for the amount of the invoice or invoices covering such shipment is presented to the paying bank in accordance with the financing commitment on the reverse side of this form.

3. The Certificate of Origin will be forwarded to the financing institution unless other written instructions are given by the financing institution.

4. If a dollar amount is inserted in the appropriate space on the face of this commitment form, indicating a dollar limit on drafts to be presented in any one day, Fiat-Roosevelt Motors, Inc. will be governed by that daily drafting limit. It is understood, however, that Fiat-Roosevelt Motors, Inc., because it lacks knowledge at any specific time of the total dollar value of the vehicle inventories which dealer may have on floor-plan with his financing institution, cannot be responsible for governing vehicle shipments to conform to a "total floor-plan limit." Therefore, the control of the total floor-planned inventory must rest with dealer and his financing institution.

5. In the event that the financing institution cancels or suspends the financing commitment, Fiat-Roosevelt Motors, Inc., will accept written notification of such cancellation or suspension addressed to its head office in Engelwood Cliffs, N.J. Telephoned or telegraphed notification will also be accepted, provided written confirmation of such notification is forwarded immediately.

6. Upon receipt of notification of cancellation or suspension, Fiat-Roosevelt Motors, Inc. will make every reasonable effort to stop shipments or deliveries to dealer immediately; but, where such shipments or deliveries cannot be stopped, Fiat-Roosevelt Motors, Inc. will draft for shipments or deliveries made up to and including the second business day following receipt of the notice of cancellation or suspension, in accordance with the provisions of the financing commitment.

7. Sight drafts will be drawn on the dealer's financing institution for certain Fiat automobiles delivered to dealer in accordance with dealer's written orders.

8. The sight draft will be presented to you by certified mail, and attached to our sight draft will be an invoice for each Fiat automobile and the Certificate of Origin. (Even if your state does not require a Certificate of Origin, it nonetheless is a title document in most of the several states and, therefore, is to be retained by you for a retail purchaser may need it to properly title the Fiat in another state.)

9. We consider our draft to be payable on sight, and any delay is to be immediately called to our attention.

10. With each draft we enclose a copy of our payment instructions and an addressed envelope that is to be used in forwarding payment as well as the telephone number and person to speak to if payment is not immediate.

defendant bargained for because, of course, upon payment defendant immediately began to earn interest which was compensation for the necessary monitoring of the vehicles to insure that when BRI retailed the vehicle Mellon would be paid by BRI for the financing provided by Mellon.

Mellon contends that under the Spring Incentive Program for 1981, however, it *could not* pay for the invoices it received for a period of 120 days or upon sale of the vehicle by BRI and that this was a material alteration of its bargain and of the conditions under which it was obliged to honor invoices. This operated to its detriment, because although it would not begin to earn interest until 120 days after receipt of the invoice for a vehicle or when the vehicle was sold, if ever, it, nevertheless, would have to monitor the vehicles at BRI to insure that BRI did not sell a vehicle and fail to pay Fiat thereby requiring Mellon thereafter to make payment for the vehicle, which had already been sold and the proceeds thereof misapplied.

Fiat argues that there was no alteration or modification of the WFC, because the matter appearing on the reverse side of the WFC was never a part of the *contractual* obligation of the defendant or the conditions precedent to the defendant's obligation to honor invoices. Rather, plaintiff contends, this material simply was provided for the *information and guidance* of the financing institutions. Moreover, Fiat contends, the reference in the last paragraph on the front side of the WFC to the "further explanation" on the reverse side had to do only with paragraphs 5 and 6, which referred to the procedure by which Mellon could cancel or suspend the WFC.

■ We agree with the position taken by Fiat. First, it is obvious from a reading of those paragraphs on the reverse side of the WFC that they do not purport to establish the conditions which give rise to the obligation to honor plaintiff's drafts. In fact, they plainly are exactly what their title implies; viz, Fiat's "Policy And Drafting Procedure," set out for the *information*

*and guidance* of the financing institutions, and not as additional commitments of the defendant.

Second, the reference in the last paragraph of the WFC which makes specific reference to the "further explanation on the reverse side" of the form has to do with defendant's *right of cancellation* and concludes with the statement that "the further explanation on the reverse side of this form has been noted by us." The reference is to the *explanation* not to any *conditions* on the reverse side.

Finally, at the bottom of the front side is the notation "FRM–1010 (R5–25–72) (SEE *DRAFTING POLICIES* ON REVERSE SIDE)." (emphasis supplied). This is a further indication that those paragraphs purport to be the procedures and policies of the *plaintiff* which are provided for the defendant's information and guidance and are not part of the terms of the letter of credit *issued by the defendant.*

What the defendant found objectionable under the Spring 1981 Program, was the possibility (albeit a very real one) that BRI could sell a vehicle within the 120 day period and, therefore, not have to finance it through the defendant bank at all, but, as we stated above, that the defendant nevertheless would have to inventory and monitor the vehicle during this period of time in order to protect itself against a sale and misapplication of funds by BRI, and, as occurred here, the subsequent demand for payment by Fiat.

The defendant's dissatisfaction with that arrangement is understandable, but the defendant's recourse was to cancel (or perhaps formally suspend) the WFC, which it had the right under that agreement to do, *but admits it did not do.* Had the defendant elected to cancel or suspend, then under the terms of the WFC defendant would have been relieved of its obligation within two working days of written notice of cancellation.

In addition, the defendant had a security interest in certain property of BRI and had filed Uniform Commercial Code financing

statements in connection therewith. The parties disagree as to whether or not this provided the defendant with a security interest in new vehicles on BRI's premises for which Fiat had not yet been paid. The plaintiff argues that the defendant was fully protected by the security interest and financing statements, and, therefore, was not prejudiced by the 120 day delay in the invoice and draft payments, the defendant argues that it was not protected, and thus was prejudiced.

Whether defendant did or did not have a viable security interest is unimportant, however, because it is clear that in addition to its cancellation and suspension rights under the WFC the defendant had the right to withdraw the waiver of receipt of the manufacturer's certifications of origin ("MCO"), which it had given to the plaintiff. (See findings 13–13A, *supra*). Both parties agree that these documents are necessary to a transfer of title by dealers to retail purchasers of new automobiles. Under the WFC, plaintiff indicated that it would send the MCO directly to the defendant "unless other written instructions are given by the [defendant]." (See ¶¶ 3 and 8 of footnote 4, *supra*). In states such as Pennsylvania which require the MCO as a condition to the issuance of a certificate of title, *see* 75 Pa.C.S.A. § 1103(c), the retention of the MCO by a financing institution until it is paid for financing by the dealer affords the financing institution absolute security against the sale of the vehicle by the debtor without payment to the financing institution for the simple reason that the dealer cannot transfer title to the purchases without the MCO.

However, in this case, on January 18, 1977, Mellon executed a "waiver of certificate of origin" in favor of BRI and sent that directly to Fiat, which in accordance with the waiver thereafter sent the MCO's directly to BRI. This, of course, enabled BRI to sell a motor vehicle and transfer title thereto without contemporaneously paying Mellon. Mellon could have revoked its waiver of the MCO with regard to the Spring 1981 Program and thereafter conditioned release of the MCO upon payment to Mellon from BRI of the loan for the respective vehicle or proof that BRI had paid Fiat. A cumbersome procedure, perhaps, but a viable alternative to the cancellation or suspension rights which Mellon had under the WFC, which Mellon chose not to exercise

We conclude that there was no alteration of the terms of the letter of credit with regard to the vehicles shipped under the Spring 1981 Program, that the only conditions precedent to Mellon's *obligation* to pay Fiat for invoices or to honor drafts under the WFC are found on the front side of the WFC, as set forth in our finding No. 11 at p. 4, *supra*, and that Mellon suffered no prejudice under plaintiff's Spring 1981 Program.

Mellon also contends, however, that it was not obligated under the WFC to pay the invoices for the twelve vehicles involved in this suit for the additional reason that there was a $50,000. per diem limit on the invoices which Fiat could present for payment. Mellon argues that it has proved that it received batches of invoices which far exceeded the $50,000. limit on one day and that, therefore, it has no obligation to pay *any* of those invoices.

On May 7, 1981, Mellon Bank received a number of invoices for Fiat vehicles shipped to BRI under the 1981 Program. Two of defendant's witnesses, Joseph J. Scrip, consumer loan manager at defendant's Homestead, Pennsylvania, branch office, and Bernadette M. Zeok, floor-plan clerk at that office, testified that to their knowledge these invoices exceeded $50,000. Ms. Zeok testified that she received invoices on May 7, 1981, and brought them to the attention of Mr. Scrip because they exceeded the $50,000. per day limit and were accompanied by the plaintiff's delayed payment instructions (Exhibit No. 12). Mr. Scrip testified that the invoices which Zeok gave to him on May 7 exceeded $100,000.

The plaintiff's only witness was Bart W. Klim, who was its banking and credit manager. He had no personal knowledge concerning the mailing of any specific invoice,

and could testify only that it was plaintiff's practice to control the mailing of invoices and drafts where there was a floor plan per-day limit under a particular WFC, so that invoices and drafts in excess of such a daily limit were held back and mailed on the following day.

However, neither plaintiff nor defendant, according to their witnesses, kept a record of the invoice numbers which were mailed or received on a particular day, so that there is no way that the court can determine how many, if any, of the twelve invoices at issue here were received by defendant on May 7, 1981. Neither can the court determine whether or not invoices mailed on different days were received on the same day.

The same is true as to another set of invoices which Mr. Scrip testified were received on either May 11 or May 12, 1981, and which totalled $162,318., and a third batch received by Mellon on or about May 15, 1981.

As indicated above, on May 7, 1981, along with the invoices and drafts which defendant received, it also received a letter containing payment instructions relative to those invoices. (Exhibit No. 12). Those instructions provided in part:

2. We request that you mail your remittance ... one hundred twenty (120) days from draft date *or* on the date of retail delivery, whichever occurs first. Note: Some dealers may request that you remit *immediately* on all drafts in your possession, thus waiving the above 120 days or retail date provision. Please contact your dealer if this applies.

The instructions also provided the name and telephone number of persons at Fiat Motors who should be contacted if any delay in making occurred.

On May 7, 1981, Mr. Scrip called a Miss Julie Tosi, one of those persons, and advised her that his office would not honor the Spring 1981 Program invoices because of the 120–day delay provision and, in any event, would not pay *any* of the invoices which he received on that day because they exceeded the $50,000. a day limit.

Mr. Scrip followed this call with a letter to Miss Tosi on May 8, 1981, (Exhibit D), in which he returned the invoices and drafts received on May 7, 1981. On May 12, 1981, he returned the invoices received on that or the previous day with a similar letter to Miss Tosi refusing to honor the 120–day delay drafts and also advising her that the invoices and drafts being returned totalled $162,318. and would not be honored for the additional reason that they exceeded the $50,000. per day limit. (Exhibit E).

Finally, on May 15, 1981, Mr. Scrip sent another letter to Miss Tosi in which he referred to his letters of May 8 and 12, and again refused to honor the 120–day-delay drafts, and requested that such drafts and invoices not be sent to the defendant in the future. (Exhibit F). Although he did not recite in the letter that he was returning invoices, the typist's remarks indicate "enclosure," and it is obvious from the context of the letter that invoices were enclosed.

While, the court believes that Fiat Motors had the procedure to guard against the mailing of invoices in excess of applicable WFC per-day limits as testified to by Mr. Klim, in view of the direct and specific testimony of Mr. Scrip and Ms. Zeok, the court believes that the Fiat practice failed as to the invoices received by defendant on May 7, 1981, and on May 11 or 12, 1981, and that on those days invoices in excess of $50,000. were received.

Defendant does not contend that any of the letters from Mr. Scrip to Miss Tosi constituted a cancellation or suspension of the WFC under its terms. However, Mellon does argue from the above that it was absolved of any obligation under the WFC to pay for *any* of the invoices which were among a group of invoices presented in any one day which totalled in excess of $50,000. We cannot agree. The WFC (Exhibit No. 2) provides only that the defendant's "obligation [under the WFC] shall not exceed $50,000. aggregate amount of invoices or drafts presented in any one day." The plain meaning of that language is that Mellon *will be liable* for invoices and drafts

presented in any one day which aggregate *up to* as much as $50,000., *but no more.* There is nothing in that language in the WFC which fairly is susceptible of the construction urged by the defendant, and the defendant has presented no persuasive argument or authority to the contrary.

The court concludes, therefore, that defendant is liable under the WFC for invoices and drafts presented in any one day which aggregate up to $50,000. And, in view of the testimony that invoices are dated and mailed when the vehicles are shipped, we find that all invoices bearing the same date were presented by plaintiff on one day and received subsequently by defendant on one day, and that up to $50,000. of invoices and drafts thus presented on the same date and no more should have been paid by the defendant.

The invoices in finding 19 are dated as follows:

7 are dated 4/30/81, and these total $61,842.00

2 are dated 5/07/81, and these total $11,390.00

3 are dated 7/29/81, and these total $27,926.00

The defendant, therefore, is liable for $50,000. of the 4/30/81 invoices, all of the $11,390. of the 5/07/81 invoices, and the $27,926. of the 7/29/81 invoices, or a total of $89,316.00. (*See* finding 19, *supra*). The court will deduct from this total the sum of $10,000., which BRI paid to plaintiff in 1981 and which plaintiff should have applied to BRI's vehicle account instead of to its parts account. Therefore, we find that the defendant Mellon is liable to the plaintiff, Fiat, in the sum of $89,316. plus interest as to each invoice from the earlier of the date of retail sale by BRI of the vehicle represented by that invoice, or 120 days after the draft or invoice date. (Exhibit Nos. 12, 11A to L, 15A to L), less $10,000. plus interest from November 30, 1981.[5]

---

5. The testimony was that the $10,000.00 was paid by BRI in November, no date was given. Since the defendant has the burden of proof on

In this breach of contract case, plaintiff is entitled to prejudgment interest only at the statutory rate of six per cent simple interest per annum. 41 P.S. § 202; *Peterson v. Crown Financial Corporation*, 661 F.2d 287 (3d Cir.1981); *Daset Mine Corporation v. Industrial Fuels Corp.*, 326 Pa. Super. 14, 473 A.2d 584 (1984).

We selected the April 30, 1981, invoices, or portion thereof, aggregating $50,000. by starting with the earliest Exhibit No. and proceeding till we reached $50,000. Thus, we selected Exhibits 11A, B, E, F, G, and $6,661.00 of Exhibit 11K.

The total prejudgment interest is $26,617.70. Judgment, thus, will be awarded to the plaintiff in the amount of $89,316., plus interest of $26,617.70, less $10,000. plus interest thereon of $2,850. for a total judgment of $103,083.70.

An appropriate order will follow.

this set-off item and has not proved an earlier date, we will use November 30, 1981, as the date from which interest will run.