**FIAT MOTORS OF NORTH AMERICA, INC.**

v.

**MELLON BANK, N.A., Appellant in No. 86–3588.**

**FIAT MOTORS OF NORTH AMERICA, INC. Appellant in No. 86–3606**

v.

**MELLON BANK, N.A.**

Nos. 86–3588, 86–3606.

United States Court of Appeals, Third Circuit.

Argued June 18, 1987.

Decided Sept. 2, 1987.

Mark F. McKenna (argued), Winters, McKenna & Arcovio, Pittsburgh, Pa., for Mellon Bank, N.A.

W. McCook Miller, Jr. (argued), J. Michael McCague, Pittsburgh, Pa., for Fiat Motors of North America, Inc.

Before SEITZ and MANSMANN, Circuit Judges, and BISSELL, District Judge.*

## OPINION OF THE COURT

MANSMANN, Circuit Judge.

In this diversity case we are called upon to determine the legal obligations of the defendant Mellon Bank to plaintiff Fiat Motors under a Wholesale Finance Commitment. We also consider a cross-appeal by Fiat regarding the proper amount of prejudgment interest to be awarded. We find that the Commitment constituted a letter of credit and for the reasons given below, we will affirm the judgment of the district court, 649 F.Supp. 245.

## I.

The plaintiff, Fiat Motors of North America, Inc., a New York and New Jersey Corporation ("Fiat"), previously known as Fiat Roosevelt Motors, Inc., entered into a Dealer Sales and Service Agreement ("Dealer Agreement") in 1975 with Bob Raymond Imports, Inc. ("BRI"), a Fiat dealership. In doing so, Fiat relied on a Wholesale Financing Commitment issued by the defendant, Mellon Bank, to Bob Raymond Imports.[1] Mellon had security agreements with BRI, and had filed financing statements perfecting its interests.[2]

On October 2, 1978 Mellon executed another financing commitment ("the Commitment" or "WFC") for the benefit of Fiat. The Commitment provided in relevant part:

In consideration of shipments or deliveries of Fiat Motor vehicles which may hereafter be made by [Fiat] pursuant to written orders of [BRI][Mellon] hereby agree[s] (a) to pay [Fiat] the total amount shown on invoices covering such shipments and deliveries ... upon presentation by [Fiat] to [Mellon] of such invoices, or (b) to pay promptly at par drafts drawn on [Mellon] for the total amount of such invoices, provided, however, (i) that [Mellon's] obligation hereunder shall not exceed $50,000.00 aggregate amount of invoices or drafts presented in any one day....

The Commitment was not limited as to time, or as to the number of Fiat motor vehicles ordered by the dealer.[3] In addition, the Commitment contained a cancellation clause stating

[Mellon's] obligation hereunder may be cancelled by [Mellon] at any time by giving [Fiat] [Mellon's] written notice of cancellation, provided, however, that no such cancellation shall be effective with respect to motor vehicles shipped or delivered by [Fiat] to [BRI] or [BRI's] designated agent up to and including the second business day following receipt by [Fiat] of such written notice of cancellation. The further explanation on the reverse side of this form has been noted by us.

The reverse side of the Commitment contained the caption "Fiat Motors of North America, Inc. Policy and Drafting Procedure" and ten numbered paragraphs.[4]

---

* Honorable John W. Bissell of the United States District Court for the District of New Jersey, sitting by designation.

1. Mellon Bank is a national banking association not having its registered office or principal place of business within either New York or New Jersey, and has its principal office and place of business within the district of the United States District Court for the Western District of Pennsylvania.

2. In January 1977, Mellon also executed a Waiver of Certificate of Origin which authorized Fiat

to "send directly to subject dealer the Certificate of Origin for the Fiat automobiles that are purchased from you until otherwise notified in writing by us."

3. Mellon's line of credit to BRI under the WFC was $250,000.

4. The numbered paragraphs read as follows:
  1. Fiat automobiles are shipped to dealers pursuant to dealers' written orders.
  2. Upon shipment or delivery to the ordering dealer or his designated agent, a sight draft for the amount of the invoice or invoices

From 1978 to 1981 Fiat shipped over 100 cars to BRI. In April, 1981, BRI opted to participate in a Fiat incentive program. Under the terms and conditions of the program, no payment to Fiat was required until the earlier of 120 days from the invoice date or retail sale. BRI bought 50 Fiats between April and July of 1981. Twelve of those 50 cars gave rise to this case.

Mellon first learned of the incentive program in late April, 1981 when it received invoices from Fiat for BRI orders under the program. Included in an April 30, 1981 mailing were invoices for seven of the twelve cars at issue. On May 7, 1981, Mellon received invoices and corresponding drafts for two of the cars at issue. The next day Mellon informed Fiat that Mellon "will not honor any invoices on the 120 day delayed payment program." On May 11 or 12, 1981, Fiat's invoices and drafts to Mellon totaled $162,318. Mellon immediately reiterated its refusal to honor the program or "to pay invoices totaling more than $50,000 on any one day." The remaining invoices for the twelve cars were dated July 29, 1981. All of the invoices and drafts sent by Fiat to Mellon up to May 15, 1981 were returned unpaid by Mellon. Mellon, however, never exercised its right to cancel the Commitment.

Fiat, as a matter of course, requires its dealers to forward to it a retail delivery receipt upon selling a car but BRI failed to do so for the twelve vehicles at issue. In November 1981, a monitoring service hired by Fiat conducted a surprise spot check of BRI's inventory and discovered several cars missing. Fiat immediately demanded payment from Mellon and BRI and retrieved the remaining vehicles and Certificates of Origin from BRI. BRI remitted $10,000, but Fiat received no further payments from either BRI or Mellon.

In June 1983, Fiat filed a complaint in the United States District Court for the Western District of Pennsylvania, alleging Mellon's breach of the Commitment. Fiat claimed damages of $101,158 (the total invoice amount for the twelve cars) plus prejudgment interest at prime rate plus one percent. Fiat subsequently moved to permit market rate, instead of the statutory

covering such shipment is presented to the paying bank in accordance with the financing commitment on the reverse side of this form.

3. The Certificate of Origin will be forwarded to the financing institution unless other written instructions are given by the financing institution.

4. If a dollar amount is inserted in the appropriate space on the face of this commitment form, indicating a dollar limit on drafts to be presented in any one day, Fiat Motors of North America, Inc. will be governed by that daily drafting limit. It is understood, however, that Fiat Motors of North America, Inc., because it lacks knowledge at any specific time of the total dollar value of the vehicle inventories which dealer may have on floorplan with his financing institution, cannot be responsible for governing vehicle shipments to conform to a "total floor-plan limit." Therefore, the control of the total floor-planned inventory must rest with dealer and his financing institution.

5. In the event that the financing institution cancels or suspends the financing commitment, Fiat Motors of North America, Inc., will accept written notification of such cancellation or suspension addressed to its head office in Engelwood Cliffs, N.J. Telephoned or telegraphed notification will also be accepted, provided written confirmation of such notification is forwarded immediately.

6. Upon receipt of notification of cancellation or suspension, Fiat Motors of North America, Inc. will draft for shipments or deliveries made up to and including the second business day following receipt of the notice of cancellation or suspension, in accordance with the provisions of the financing commitment.

7. Sight drafts will be drawn on the dealer's financing institution for certain Fiat automobiles delivered to dealer in accordance with dealer's written orders.

8. The sight draft will be presented to you by certified mail, and attached to our sight draft will be an invoice for each Fiat automobile and the Certificate of Origin. (Even if your state does not require a Certificate of Origin, it nonetheless is a title document in most of the several states and, therefore, is to be retained by you for a retail purchaser may need it to properly title the Fiat in another state.)

9. We consider our draft to be payable on sight, and any delay is to be immediately called to our attention.

10. With each draft we enclose a copy of our payment instructions and an addressed envelope that is to be used in forwarding payment as well as the telephone number and person to speak to if payment is not immediate.

six percent simple interest. The court denied that motion.

Following a bench trial, the district court awarded Fiat $103,083.70. The judgment included the full amounts of the invoices dated May 7 and July 29, 1981, $50,000 of the total invoices dated April 30, 1981, and six percent interest thereon. The award deducted from Fiat's claim the $11,842 by which the April 30, 1981 invoices exceeded the Commitment's $50,000 daily liability limit, and the $10,000 which BRI paid Fiat in November of 1981.

The district court found that the Commitment constituted a letter of credit but found no material modification by Fiat due to its incentive program. The court specifically rejected Mellon's view that its contract with Fiat included the statement of policy and drafting procedure (particularly paragraphs 7, 8, and 9) on the back of the Commitment. The court also dismissed Mellon's claim that Fiat's invoices and drafts in excess of the $50,000 per diem liability limit on April 30, 1981 relieved Mellon of the obligation to pay for all twelve cars in question. This timely appeal followed.

## II.

On this appeal, Mellon presents four issues. Mellon argues that the district court erred as a matter of law in finding that Fiat met its obligations under the WFC with Mellon, that the district court did not apply the strict standard of compliance applicable to letters of credit, that the court failed to consider Fiat's failure to mitigate its damages, and that the court erred in admitting certain evidence concerning other branches of Mellon Bank.

On cross-appeal, Fiat contests the district court's award of 6% statutory prejudgment interest, contending that a market rate of interest should apply.

The scope of review applicable to the district court's findings of fact is whether the findings are clearly erroneous. *Anderson v. City of Bessemer City, North Carolina*, 470 U.S. 564, 572, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). We review a trial judge's decision to admit evidence by an abuse of discretion standard. *United*

*States v. Stewart*, 806 F.2d 64 (3d Cir. 1986).

■ Contract interpretation is reviewable on a clearly erroneous basis, but our review is plenary when determining the legal effect of an agreement on an event the parties did not foresee. *See Ram Construction Co., Inc. v. American States Insurance Co.*, 749 F.2d 1049 (3d Cir.1984).

## III.

The district court found that the Wholesale Finance Commitment agreed to between Fiat and Mellon was a letter of credit within the meaning of the Uniform Commercial Code, §§ 5–102, 103; 13 Pa.C.S.A. § 5102(a)(1) and § 5103(a). These provisions define a letter of credit as "an engagement by a bank ... at the request of a customer, and of a kind within the scope of this division that the issuer will honor drafts or other demands for payment upon compliance with the conditions specified in the credit." 13 Pa.C.S.A. § 5103(a). The relevant scope of the provision is set forth in 13 Pa.C.S.A. § 5102(a)(1): "This Article applies to a credit issued by a bank if the credit requires a documentary draft or a documentary demand for payment."

■ As we noted in *Toyota Industrial Trucks v. Citizens National Bank*, 611 F.2d 465 (3d Cir.1979), a credit arrangement between a bank and a seller need not state that it is a letter of credit before the agreement is covered by the Uniform Commercial Code. A letter of credit must, however, meet the formal requirements of being in writing, and signed by the issuer. 13 Pa.C.S.A. § 5104(a).

■ The Wholesale Finance Commitment at issue in this case meets the requirements of an Article Five letter of credit. The Commitment specifies that Mellon Bank will honor drafts or invoices submitted by Fiat, not to exceed $50,000.00 in aggregate invoices presented in any one day. The Commitment was signed and sent to Fiat. The Commitment specified that the arrangement was to be continuous but could be revoked by Mellon upon written notice to Fiat, which would not be

effective until two business days after receipt of the written notice of cancellation. Thus, under the Uniform Commercial Code and our prior decisions, the WFC was a valid letter of credit. *See also Banco Nacional de Desarrollo v. Mellon Bank, N.A.,* 726 F.2d 87 (3d Cir.1984).

■ Mellon argues that the terms on the reverse side of the WFC were part of the obligations under the WFC, and were thus erroneously determined by the district court to be informational and not additional commitments of the WFC. Thus Mellon claims that the paragraphs on the reverse side of the Commitment are material terms, whose alteration results in suspending the issuer's responsibility to pay. In this case the claimed breach relates to the sight draft paragraphs (7, 8, 9) and its alleged unilateral alteration by Fiat to a 120 day payment provision.

The district court found that the terms were not part of the letter of credit, but were merely informational. We agree that these paragraphs do not establish conditions giving rise to the obligation to honor Fiat's drafts nor conditions whose alteration suspends Mellon's obligation to pay.

A close inspection of the "Policy and Drafting Procedure," as the paragraphs are titled, reveals that it is a very general form intended to be used by a variety of financing institutions without detailed memoranda regarding the form of presentment or documents required. Rather, the policy merely states that a sight draft will be presented by certified mail, along with an invoice in duplicate and the Certificate of Origin for each vehicle. While the language indicates that a sight draft requires immediate payment, the terms are clearly not meant to be additional commitments by Mellon vis-a-vis Fiat. They are general guidelines by Fiat vis-a-vis a multitude of financing institutions.

Additionally, as noted by the district court, the reference to these paragraphs on the face of the WFC refers in large part to an explanation of the defendant's right of cancellation. Thus, the terms may once again be described as explanations and not conditions for payment.

■ Mellon next argues that Fiat failed to meet its obligations under the Wholesale Finance Commitment, thus releasing Mellon from its obligations under the instrument. Specifically, Mellon contends that the "1981 Incentive Program," permitting a delayed payment for Fiat automobiles rather than payment upon a sight draft, was a material breach of a letter of credit. Since a letter of credit normally requires strict compliance with its terms, Mellon argues that this change materially altered the terms, thus excusing performance by Mellon. We find no merit in Mellon's position.

We have insisted that parties strictly comply with the terms of letters of credit. *See Chase Manhattan Bank v. Equibank,* 550 F.2d 882 (3d Cir.1977). Even under this standard, we find no breach by Fiat.

First, as we noted above, the contested paragraphs do not comprise the terms and conditions of the agreement. The plain language of the agreement commits Mellon to pay invoices and drafts of up to $50,000 presented in any one day. In fact, no other commitment was made by Mellon.

Second, Mellon argues that the submission of invoices over the agreed dollar limit and the delayed payment program, either separately or together, constitute such noncompliance by Fiat that Mellon was relieved of *all* of its obligations. However, Mellon's only commitment was to pay up to $50,000. Thus the submission of invoices over that dollar limit merely limits Mellon's liability on that date to $50,000. In the same vein, Fiat's delayed payment program was primarily an agreement between Fiat and its dealers. In a letter of credit context, the exchange of the bargained for documents between the issuer and the beneficiary is the key to performance. In this case, the bargained for documents were invoices or drafts drawn on Mellon. After the delayed payment program Mellon continued to receive those documents, albeit over Mellon's aggregate payment obligation. Thus, Mellon was obligated up to the $50,000 upon the presentment of the invoice or drafts.

## IV.

■ We next consider the issue of mitigation of damages. This issue was specifi-

cally raised as one of defendant Mellon's affirmative defenses. In an intermediate proceeding, Mellon moved for summary judgment against Fiat. The district court, in its denial of Mellon's motion, directly addressed this issue and concluded that material issues of fact remained as to whether the plaintiff had exercised reasonable diligence in avoiding the losses sustained. In its opinion following the bench trial, the district court did not explicitly comment upon this issue, but did expressly assess the damages to Fiat including interest and a $10,000 payment made by BRI to Fiat. We therefore conclude that the district court implicitly addressed the issue of mitigation of damages. Our review of this conclusion of law is plenary. *See Ram Construction Co., Inc.,* 749 F.2d 1049.

In the absence of any specific Pennsylvania statutory enactments or case law directly impacting on mitigation of damages with respect to letters of credit, both parties have cited our 1979 decision in *Toyota Industrial Trucks,* 611 F.2d 465. In *Toyota Industrial Trucks* we found no need to predict whether the Pennsylvania courts would impose a duty to mitigate upon the seller in a letter of credit case, because in that case no duty to mitigate had been established. We noted in *Toyota* that the remedy for a wrongful dishonor of a draft submitted pursuant to a letter of credit is stated in U.C.C. § 5–115(1). That section provides that the beneficiary has the rights of a person in the position of a seller, and may recover the face amount of the draft together with incidental damages, less any amount realized by resale. There is thus no explicit requirement of mitigation under the Uniform Commercial Code.

However, the general concept of mitigation of damages in a contract action has long been a part of contract law in general, and Pennsylvania law in particular. *See Thompson v. DeLong,* 267 Pa. 212, 110 A. 251 (1920). That concept implies a limitation on damages which an injured party might receive by virtue of the party's avoidance of loss without undue risk, bur-

den or humilation. The injured party is not precluded from recovery to the extent that reasonable, but unsuccessful efforts to avoid loss have been made. *See* Restatement of Contracts, 2d § 350; 11 Williston on Contracts, § 1353 (3d ed. 1968).

We reiterated in *Toyota* that:

The duty to mitigate damages is not applicable where the party whose duty it is primarily to perform a contract has equal opportunity for performance and equal knowledge of the consequences of the performance.

*Id., quoting S.J. Groves & Sons v. Warner Co.,* 576 F.2d 524, 530 (3d Cir.1978) (applying Pennsylvania law).

As in *Toyota Industrial Trucks,* we need not reach the legal question of the existence of a duty to mitigate under Pennsylvania law since we find that no duty would arise under the facts presented here. Fiat had notice as early as May 7, 1981 that Mellon did not intend to honor Fiat's drafts relative to the 120 day delayed payment program. Fiat nonetheless presented Mellon with several other drafts pursuant to the program and exceeding the $50,000 limit of the WFC. Although Fiat's stance at this point may have been suspect, Mellon's actions were equally unproductive of avoidance of loss.

Mellon had, vis-a-vis Fiat, the unqualified right to cancel, or to formally suspend the WFC. It took neither of these actions, but instead took the equivocal step of returning the invoices and stating that "[they] could not honor invoices on the 120 day delayed payment program." Moreover, Mellon could have rescinded its Waiver of the Manufacturer's Certificate of Origin ("MCO"), without which a certificate of title may not be issued by the dealer. The retention of the Manufacturer's Certificate of Origin by a financing institution until the institution is paid by the dealer affords the financing institution almost absolute security against the sale of the vehicle by the debtor without payment to the financing institution because the dealer simply cannot transfer title to a vehicle without an MCO.[5]

---

5. We note as well that Mellon had a security interest in property of Bob Raymond Imports,

and had filed U.C.C. financing statements in

We are therefore drawn to the conclusion that both parties might have protected themselves by acting more prudently. However, under these circumstances, Fiat may not be charged with a duty to mitigate since Mellon could have mitigated any damages itself. *See Toyota Industrial Trucks,* 611 F.2d at 473–74.

We, therefore, will affirm the judgment of the district court in this respect.

## V.

The sole issue presented by Fiat in its cross-appeal is that the district court erred in calculating prejudgment interest on the principal amount of damages, at the rate of six percent simple interest per annum. 41 Pa.Cons.Stat.Ann. § 202 (Purdon's 1986). Fiat contends that interest should have been calculated in an amount greater than the 6% statutory limit, and that such an award is within the district court's discretion. We find Fiat's argument without merit, and we will affirm the judgment of the district court.

The legal rate of interest in Pennsylvania is fixed at six percent by statute. 41 Pa. Cons.Stat.Ann. § 202. Pennsylvania also has traditionally followed the Restatement (Second) of Contracts § 354 [6] which provides:

> (1) If the breach consists of a failure to pay a definite sum in money or to render a performance with fixed or ascertainable monetary value, interest is recoverable from the time for performance on the amount due less all deductions to which the party in breach is entitled.
> Comment:
> (a) Scope. This Section deals with an injured party's right to interest as damages in compensation for the deprivation of promised performance. Had the performance been rendered when it was due, the injured party would have been able to make use of it. Interest is a standardized form of compensation to the injured party for the loss of that use, in the absence of agreement to the contrary. It is payable without compound-

ing at the rate, commonly called the "legal rate," fixed by statute for this purpose.

We recognize that the Pennsylvania courts have also allowed a discretionary approach to the award and rate of interest in equity cases. *See Daset Mining Corporation v. Industrial Fuels Corporation,* 326 Pa.Super. 14, 473 A.2d 584, 595 (1984). In *Peterson v. Crown Financial Corporation,* 661 F.2d 287 (3d. Cir.1981) for example, we noted that in cases sounding in restitution, the court's broader equitable powers could be exercised, and that damages in the nature of prejudgment interest greater than 6% were permissible.

■ The question presented to us is, therefore, whether this case falls within the purview of the Restatement (Second) of Contracts or under some equitable doctrine which might implicate the court's discretionary powers. We conclude that this case is a contract action. Fiat has proved that the defendant Mellon breached a promise to pay a definite sum of money. In such a case the plaintiff Fiat is entitled to interest at the legal rate of 6% as a matter of law. *See Peterson v. Crown Financial Corp.,* 661 F.2d at 293.

We find the case of *Rizzo v. Haines,* 357 Pa.Super. 57, 515 A.2d 321 (1986), cited by the cross-appellant, inapposite. In that case the court did authorize an award at the market rate of interest. In *Rizzo v. Haines,* however, the Superior Court authorized such an award upon funds which were found to have been wrongfully held by an attorney in a constructive or resulting trust for his client. Such a case clearly invoked the trial court's equitable powers, as it sounded in tort rather than contract. We, therefore, find nothing in *Rizzo* to dissuade us from our holding above.

## VI.

After careful consideration we find no abuse of discretion in the district court's

---

connection with that interest. The record is unclear as to the precise scope of the security interest involved.

**6.** Formerly § 337.

decision to admit evidence concerning other branches of Mellon Bank.

For the reasons stated above, we will affirm the judgment of the district court.