Paul M. PRUSKY, et al.

v.

**RELIASTAR LIFE INSURANCE COMPANY**

No. CIV.A. 03–6196.

United States District Court,
E.D. Pennsylvania.

Jan. 5, 2007.

Kellie A. Allen, Salmon, Ricchezza, Singer & Turchi LLP, Bruce P. Merenstein, Schnader Harrison Segal & Lewis, Philadelphia, for Paul M. Prusky, Steven G. Prusky, Plaintiffs.

Edwin G. Moodhe, Debevoise & Plimpton LLP, New York, NY, Mathieu Shapiro, Obermayer, Rebmann, Maxwell & Hippel, LLP, Philadelphia, for Reliastar Life Insurance Company, Defendant.

Dennis R. Suplee, Schnader Harrison Segal and Lewis, L.L.P., David H. Weinstein, Weinstein Kitchenoff Asher LLC, Andrea L. Wilson, Weinstein Kitchenoff & Asher LLC, Philadelphia, for Paul M. Prusky, Steven G. Prusky, Plaintiffs.

## MEMORANDUM

DALZELL, District Judge.

Between February and August of 1998, Paul and Steven Prusky, as trustees of the MFI Associates, Ltd. Profit Sharing Plan ("Plan"),[1] entered into seven variable life insurance contracts with ReliaStar Life Insurance Company. In November, 2003, claiming that ReliaStar was violating the terms of those contracts, the Pruskys filed this lawsuit. After an involved procedural history, which we review in detail below, we are finally in a position to rule on the Pruskys' motion for summary judgment under Fed.R.Civ.P. 56.[2]

### Factual Background

In 1998, the Plan purchased seven variable life insurance policies from ReliaStar with face values of between $2 million and $10 million each. The policies jointly insured the lives of Paul Prusky and his wife, Susan, and provided for payment of the death benefit upon the death of both insureds. These policies permitted the Plan to invest their cash values in the Select*Life Variable Account, a unit investment trust created under the Investment Company Act of 1940. See 15 U.S.C. § 80a–4. The Variable Account was further divided into a series of mutual fund sub-accounts, allowing the trustees to select from a portfolio of mutual funds for investment.

When it issued the policies, ReliaStar was aware that the Pruskys intended to engage in an investment strategy known as "market timing." Market timing is an arbitrage strategy that seeks to benefit from information affecting the valuation of a mutual fund that is not yet incorporated into the net asset value ("NAV") of the fund shares, a value that is typically calculated only once per day. Because it seeks to take advantage of short-term discrepancies between the price and the NAV of mutual fund shares, this strategy requires frequent trading. Although mutual fund companies often frown upon market timing, it is a perfectly legal strategy.[3]

ReliaStar's prospectus for its variable life insurance policies allowed for only four transfers a year, a number that would be inadequate for implementing the Pruskys' market timing strategy, so the Plan negotiated an amendment to each of the policies, which was signed in each case by ReliaStar Vice–President M.C. Peg Sierk. These amendments have been referred to throughout the litigation as the "Sierk Memos". The Sierk Memos allowed the Plan to make unlimited transfers between the sub-accounts within the Variable Account by phone or fax without any fee and

---

1. The Plan was formerly known as the Windsor Securities, Inc. Profit Sharing Plan.

2. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In resolving a motion for summary judgment, the Court must draw all reasonable inferences in the non-movant's favor, *Bartnicki v. Vopper*, 200 F.3d 109, 114 (3d Cir.1999), and determine whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lob-*

*by, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

3. The Pruskys also sought to use a practice commonly known as late trading, which allowed them to trade after the daily NAV calculus for the fund. This strategy violates the Securities and Exchange Commission's forward pricing rule, 17 C.F.R. § 270.22c–1(a). The SEC and other authorities have recently cracked down on late trading in the mutual fund industry, and in November, 2002, ReliaStar notified the Pruskys that federal law precluded it from conforming with their late trading requests. The Pruskys do not seek to enforce the late trading provisions of their agreement with ReliaStar.

waived any restriction as to the dollar amount of those transfers. Paul Prusky began making sub-account transfer requests in March, 1998. Often, these requests were made daily.

In September of 2003, Eliot Spitzer, then New York State Attorney General, announced that he was investigating late trading and market timing schemes in the mutual fund industry for potential violations of state and federal law. *See* Def. Mem., Exh. 2. As a result, many fund companies began scrutinizing their investors' transactions for suspicious trades. On October 6, 2003, ReliaStar received an inquiry from Pioneer Investment Management, one of the fund companies with which the Variable Account was invested, about a series of trades that Pioneer thought might be linked to market timing. When ReliaStar investigated, it found that the Plan had made the trades. On October 8, 2003, Christie Gutknecht, a director at ING, ReliaStar's parent company, sent a letter to Paul Prusky noting that Pioneer was concerned by the transactions and had a no-market-timing policy.[4] The letter informed Prusky that, effective immediately, he would only be able to make trades in Pioneer funds by U.S. Mail. The October 8 letter went on to warn that any further market timing transactions would result in the placement of a similar restriction on all trading under the policies.

This eventuality could not have taken the Pruskys by surprise. The next day, they sent a response to Gutknecht, with a copy to their attorney, asserting their view that ReliaStar had violated the terms of the insurance contracts and threatening to hold ReliaStar liable for any losses as a result of refused transaction requests. Notwithstanding these threats, on November 5, 2003, after a similar inquiry from

Fidelity, Gutknecht informed Prusky that ReliaStar would no longer accept trades by phone or fax but would require all trades to be made by U.S. Mail.

Again, the Pruskys were prepared. The next day, Steven Prusky wrote to Gutknecht:

In response to your letter of this week regarding restrictions on transfers concerning the Fidelity Advisor High Income fund, I hereby strenuously protest. Your actions are in violation of your contracts with us.

In light of this breach, we will follow these procedures: we will continue to send you two faxes, one noting our "desired" exchanges, representing what our transfers would be if not restricted by you, the other fax noting our "actual" exchanges, representing exchanges that meet your restrictions.

By this method we will track our damages and hold ING Reliastar responsible for them. The actual exchanges are our best attempt at mitigating those damages. If you believe there is a better course of mitigation, please inform us immediately so we can consider it.

Prusky Decl., Exh. 37.

Within a week, the Pruskys sued. The Plan has continued to send ReliaStar daily sub-account transfer requests, which ReliaStar has not executed. For reasons that are not disclosed in the record, the Plan has not sent ReliaStar requests for "actual" exchanges. Instead, Paul Prusky transferred the balance of all seven policies into ReliaStar's money market sub-account "in order to mitigate any damages and minimize risk." Prusky Decl., ¶ 5.

*Procedural History*

On August 4, 2004, the Pruskys filed a motion for partial summary judgment as to

---

4. Though the record does not make it apparent, we assume for purposes of this motion that Pioneer did, in fact, have such a policy

and that it had communicated that policy to ReliaStar.

liability. On December 7, 2004, Judge Hutton, finding that the late trading provisions rendered the contract illegal and therefore void, granted summary judgment *sua sponte* to ReliaStar. *Prusky v. Reliastar Life Ins. Co.*, 2004 WL 2827049 (E.D.Pa. Dec.7, 2004). The Pruskys appealed.

The Court of Appeals found that, although the late trading provisions were illegal, they were not the central purpose of the contracts and so disregarding those provisions would not defeat their purpose. *Prusky v. Reliastar Life Ins. Co.*, 445 F.3d 695, 699–700 (3d Cir.2006). It therefore reversed and remanded the case.

During the pendency of the appeal, however, Judge Hutton had retired and so, upon its return to this Court, the case was reassigned. The Pruskys filed the current motion for summary judgment on June 14, 2006. Although the motion was fully briefed by July 5, we delayed ruling on the motion at the request of the parties so that they might engage in settlement discussions. Despite Magistrate Judge Rice's patient mediation and the parties' repeated assurances that settlement discussions were proceeding fruitfully, the litigants now agree that settlement is impossible and so we must now decide the Pruskys' motion.

*Analysis*

The Pruskys' claim, simply stated, is that ReliaStar breached its contract with them, particularly the terms in the Sierk Memos, when it refused to execute subaccount exchanges received by telephone or fax after November 5, 2003. The Sierk Memos explicitly allowed exchanges by phone and fax: "Transfer requests may be made in writing to the home office of RLIC or, at the policyholder's choice, via telephone, fax or other electronic substitute in accordance with a properly executed Telephone Transfer Authorization Form (TTA)." Pl. Mem., Exh. I (emphasis omitted). ReliaStar defends itself by claiming that its performance has become impracticable because of changes in the mutual fund industry in the wake of the late trading investigation.

 Pennsylvania courts have recognized the doctrine of discharge by supervening impracticability embodied in the *Restatement of Contracts*. "Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate to the contrary." *Luber v. Luber*, 418 Pa.Super. 542, 614 A.2d 771, 774 (1992) (quoting Restatement (Second) of Contracts § 261 (1979)). Thus, in order to have its performance discharged on grounds of impracticability, ReliaStar must show that (1) performance is actually impracticable, (2) it did not cause the situation that has resulted in that impracticability, and (3) the parties predicated their agreement on the assumption that this situation would not arise. Because ReliaStar cannot demonstrate either that performance is now impracticable or that the parties assumed this situation would not arise, its defense of impracticability fails.

ReliaStar's claim is that the reactions of both the fund companies and the SEC to the late trading scandal prevented it from continuing to allow the Plan to make market timing trades.[5] ReliaStar asks us to

---

**5.** Traders who engage in market timing of mutual funds will generally make large purchases of funds that are undervalued and then redeem their fund shares once the valuation anomaly has corrected itself, often the following day. Thus, as in most arbitrage strategies, market timing is characterized by large

find that "the practices and policies adopted by fund companies to enforce their zero tolerance for frequent traders, as manifested by their routine instructions to financial intermediaries (like ReliaStar) to restrict and prohibit such frequent trading, render it futile for ReliaStar to attempt to process electronic trade requests from Prusky that will only be rejected." Def. Mem. at 21.

■ We note, first, that ReliaStar has not demonstrated the existence of a "zero tolerance" policy at any fund, much less at all of them. Further, futility is not the same as impracticability. The usual situations in which impracticability arises involve either extreme difficulty or expense, or the threat that performance will result in injury. *See* Restatement (Second) of Contracts § 261, cmt. d. None of those situations is present here. A party to a contract cannot refuse to perform its obligations merely because it believes that such performance would be fruitless.

■ Even if futility were sufficient grounds for discharging ReliaStar's duties, it has not shown that attempting to place the Pruskys' trades would necessarily be futile. Not all funds restrict market timing, and the new regulations the SEC promulgated [6] do *not* require funds to do so. There may, therefore, be funds available in the Variable Account that would accept the Plan's trades without condition or with conditions less strict than those that ReliaStar has imposed. Further, before claiming impracticability, "a party is expected to use reasonable efforts to surmount obstacles to performance." *Id.* At a minimum, that would certainly include attempting to place the trades.

The prospectus for the policies provides that "[a]ll transfers are also subject to any charges and conditions imposed by the Fund whose shares are involved." Pl. Mem, Exh. G at 32. Thus, when ReliaStar has received specific instructions from a fund to prohibit or restrict trading, the contract allows ReliaStar to condition its performance on compliance with those instructions.[7] ReliaStar fails to demonstrate, however, that it ever received any instructions to restrict the Plan's trading. The materials ReliaStar submitted contain a request to investigate a particular trade, *see* Def. Mem., Exh. 3, but no instructions to take any action based on that investigation. ReliaStar's 30(b)(6) witness testified at her deposition that it was her "understanding" that Fidelity and Janus had refused to honor trades from the Plan,[8] but she had no personal knowledge of any restriction. Pl. Mem., Exh. L, at 72–75.

Even if a request to limit the Plan to trades by mail was received from one or more funds, the contract only allows ReliaStar to enforce conditions imposed by the funds themselves, not to impose conditions

---

fund purchases which are immediately redeemed.

6. We discuss these in more detail below.

7. The Pruskys claim that the Sierk Memos modified this term and require ReliaStar to credit the Plan for the income from a requested purchase and redemption even if the fund company prevents ReliaStar from actually making the transaction. First, the language the Pruskys cite ("RLIC will accept and effectuate all transfers to and from all sub-accounts", Pl. Mem., Exh. I) does *not*, without further clarification, support such a specific reading. Second, no reasonable finder of fact could determine that, under these conditions, a sophisticated and risk-averse financial institution such as ReliaStar would knowingly enter into an agreement that required it to pay, without qualification, returns on an investment it could not actually make. We, therefore, read the contract terms as allowing ReliaStar to enforce conditions placed on fund transactions by the fund companies.

8. The documents ReliaStar submitted make *reference to investigation requests from Pioneer and Fidelity, but not Janus.*

of its own. Unless ReliaStar had received a request from *every fund available in the Variable Account,* therefore, its current restriction would exceed the scope of what the contract allows.

ReliaStar claims that "fund companies can and will immediately order ReliaStar to restrict or prohibit trading by Prusky," Def. Mem. at 25, and that the Plan's trades "would lead immediately and inexorably to demands that such trading be interdicted," *id.* at 26, 614 A.2d 771. Even were those statements known to be true—and it is at best implausible that ReliaStar can make such predictions with any certainty—it would not excuse ReliaStar's performance under the contract. The Plan is entitled to complete performance from ReliaStar until such conditions *are actually imposed* by the funds themselves.

As the declaration of Susan G. Persio states, even were a fund to determine that some intervention was necessary, it is not known exactly what form that intervention would take. *See* Persio Decl. ¶ 8 (listing warning, restriction to non-electronic trading, and temporary prohibition against all trading as possible fund responses to market timing); *see also* Def. Mem., Exh. 14 (requesting information on a particular fund family's policy for intervention with frequent traders).[9]

Based on all of this, it is clear that, although restrictions the funds imposed might ultimately prevent the Plan from pursuing its chosen investment strategy, they do not make ReliaStar's compliance with the terms of its agreement impracticable.

ReliaStar's second claim is that SEC Rule 22c–2, originally promulgated in March of 2005, renders its performance impracticable. The rule, codified at 17 C.F.R. § 270.22c–2, places specific requirements on any funds that allow their holders to engage in market timing or other short-term redemption strategies. It also requires funds to enter into agreements with intermediaries to ensure that they can investigate trades that may violate their market timing policies. Notably, the rule does *not* itself restrict market timing nor does it impose any requirements on investors.

ReliaStar's claim that the rule renders performance impracticable fails for two reasons. First, the rule did not take effect until December 4, 2006, more than five months after ReliaStar filed its brief in this case and more than two years after it first refused to perform under the contracts. More importantly, the rule places requirements only on the funds themselves, not on financial intermediaries such as ReliaStar.[10] It is true that compliance with the rule would have the effect of requiring ReliaStar to enforce restrictions on the Plan that the funds imposed. As we have already discussed above, however, ReliaStar can do that while still complying with the terms of the contract. Thus, Rule 22c–2 does not support an argument for the impracticability of ReliaStar's performance.

---

**9.** This exhibit includes unredacted social security numbers, account numbers, and transaction amounts for ReliaStar clients who are not involved in this lawsuit. Since these documents are now a matter of public record, it would be prudent for ReliaStar to seek to redact that information from the docketed copy.

**10.** An earlier version of the rule, which never took effect, was worded so as to require financial intermediaries to enter into a shareholder information agreement with the funds for which they acted as a broker. Even under that version of the rule, nothing in the regulations made performance impracticable for ReliaStar since it voluntarily entered into such agreements with many funds in advance of the rule's effective date.

■ .The final problem with ReliaStar's claim of impracticability is that the contact was not predicated on an expectation that the supervening event—in this case, the desire of the funds to restrict the Plan from certain trades—would not occur. The first and most obvious sign that this is not unexpected is that ReliaStar's prospectus specifically addresses this situation. The prospectus warns investors that funds *may* impose fees or conditions beyond those identified in the prospectus. *See,* Pl. Mem., Exh. G at 32. Just as important, however, both the strategy of market timing and the mutual funds' "distaste" for the practice were well known in the industry when the parties entered into their agreement. *Prusky,* 445 F.3d at 701 n. 12 (citing *Windsor Secur., Inc. v. Hartford Life Ins. Co.,* 986 F.2d 655, 666 (3d Cir. 1993)). Since ReliaStar knew from the negotiation of the Sierk Memos that the Plan intended to engage in frequent trading, it cannot have been a basic assumption of the contract that the funds would raise no objection to such trades. This reason alone would be enough to defeat ReliaStar's claim of impracticability.

Because we determine, as a matter of law, that ReliaStar's impracticability defense fails and because ReliaStar raises no other defense, we conclude that ReliaStar has breached—and continues to breach—its agreement with the Plan. While the insurance policies allow ReliaStar to enforce conditions on trading imposed by the funds, they do not permit ReliaStar to unilaterally prohibit the Plan from requesting trades by electronic means as they have done.

*Damages*

■ The Pruskys also seek retrospective damages in the amount of $1,215,272.21 for the period between October, 2003 and April, 2006, as well as additional damages in an undetermined amount for the period since April 30, 2006. Because the Pruskys have continued their daily faxes of "desired" trades, they claim, we can track with precision the loss caused by ReliaStar's breach. ReliaStar argues both that this measure of damages is misleading and that the Pruskys' mitigation of damages was inadequate. Because both of these issues are rife with disputed questions of fact, we will not address them here but will instead hold them over for a hearing.

### ORDER

AND NOW, this 5th day of January, 2007, upon consideration of plaintiffs' motion for summary judgment (docket entry # 69), defendant's response (docket entry # 71), plaintiffs' motion for leave to file a reply (docket entry # 73) and the accompanying exhibits (docket entries 70 & 72) and for the reasons articulated in the accompanying Memorandum of Law, it is hereby ORDERED that:

1. Plaintiffs' motion for summary judgment is GRANTED IN PART;

2. Defendant is hereby ORDERED to perform specifically its obligation under ReliaStar Flexible Premium Variable Life Insurance policies Nos. 7000000128, 7000000343, 7000000344, 7000000345, 7000000433, 7000000659, and 7000000661 to accept and effect sub-account transfer instructions communicated by the owner of the policy by fax, telephone, or other electronic means without limitation as to the number of transfer instructions so long as those transfers are not explicitly barred by a specific condition imposed by the fund in which a sub-account is invested;

3. A hearing to determine damages shall CONVENE in Courtroom 10–B at 9:30 a.m. on February 15, 2007, and the parties shall submit pre-hearing memoran-

da, not to exceed fifteen pages a side, by February 5, 2007.[1]

---

1. We expect that, by the same deadline, the parties will submit pre-marked exhibits in two three-ringed binders, with authenticity of such exhibits deemed admitted absent written objection and reason(s) for each objection.