Paul M. **PRUSKY**, individually and as trustee, Windsor Securities, Inc. Profit Sharing Plan; Steven G. Prusky, as trustee, Windsor Securities, Inc. Profit Sharing Plan, Appellants

v.

**RELIASTAR LIFE INSURANCE COMPANY.**

Nos. 07–1691, 07–1901, 07–3408.

United States Court of Appeals, Third Circuit.

Argued April 8, 2008.

Filed July 10, 2008.

Arlin M. Adams, Esq., Bruce P. Meren-stein, Esq. (Argued), Dennis R. Suplee, Esq., Schnader, Harrison, Segal & Lewis, David H. Weinstein, Esq., Andrea L. Wil-son, Esq., Weinstein, Kitchenoff & Asher, Philadelphia, PA, for Appellants.

Joseph P. Moodhe, Esq. (Argued), Debe-voise & Plimpton, New York, NY, Mathieu J. Shapiro, Esq., Obermayer, Rebmann, Maxwell & Hippel, Philadelphia, PA, for Appellee.

BEFORE: SMITH, HARDIMAN and COWEN, Circuit Judges.

## OPINION

COWEN, Circuit Judge.

Before us are two appeals from two breach of contract actions arising out of a single set of insurance contracts. Plain-tiffs–Appellants Paul and Steven Prusky are a father-and-son team of investment advisors, and the trustees of the MFI As-sociates, Ltd. Profit Sharing Plan [1] (collec-tively "the Pruskys"). Defendant–Appel-lee is ReliaStar Life Insurance Company ("ReliaStar" or "RLIC"). In both actions, Plaintiffs alleged that ReliaStar breached their insurance contracts by refusing to allow them to engage in the frequent trad-ing of various mutual funds. The Pruskys appeal from the damages award in the first action, and from the grant of sum-mary judgment for ReliaStar in the second action. For the reasons set forth below, we will affirm both judgments.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY [2]

In 1998, the Pruskys paid several million dollars to purchase seven variable life in-surance policies from ReliaStar. The poli-cies insured Paul Prusky and his wife, and in all provided for over $42 million in death benefits. The cash values of the policies

---

1. The MFI Associates, Ltd. Profit Sharing Plan was formerly the Windsor Securities, Inc. Profit Sharing Plan.

2. Throughout this opinion, the briefs and ac-companying appendices pertaining to the damages and summary judgment appeals will be designated "I" and "II" respectively.

were placed in a variable account and divided into a number of sub-accounts. The Pruskys used those funds to invest in a variety of mutual funds offered through ReliaStar by a number of mutual fund sponsors.

The Pruskys are successful money managers with some 35 combined years of asset management experience. Together, they manage approximately $200 million of client assets. The Pruskys specialize in "market-timing," an investment strategy that capitalizes on short-term anomalies in the pricing of mutual funds. This practice entails daily risk and performance assessments of mutual funds, and requires frequent asset reallocations. While market-timing has been the subject of increasing regulatory scrutiny in recent years, it is not illegal.

The standard terms of the instant insurance policies allowed only four sub-account transfers per year. However, prior to purchasing the policies, the Pruskys negotiated a supplemental agreement with ReliaStar, the terms of which were set forth in a series of memos executed by a ReliaStar representative and by Paul Prusky (the "Sierk Memos"). The Sierk Memos provided that the Pruskys would be allowed to trade "via telephone, fax or other electronic substitute" "as often as once per day." JA II at 97a. ReliaStar further agreed to "accept and effectuate all transfers to and from all sub-accounts available to any other [variable life insurance] policyholder (without limitation, except as noted herein), with no restriction as to the dollar amount of the transfer." JA II at 97a.

All was well from the policies' inception in 1998 to the fall of 2003; the Pruskys carried out their investment strategy as desired. However, on October 8, 2003, a representative of ING, ReliaStar's parent company, wrote to the Pruskys:

You have recently been identified as participating in excessive fund timing activities in several Fund groups ... Most recently, you made several fund transfers into Pioneer Mid Cap Fund from September 19th through September 24th, October 2nd and October 8th 2003. These transactions resulted in the Pioneer Fund Manager contacting ING and informing us of a no market timing policy on this Fund.

Consequently ... based on this recent activity and our excessive trading policy outlined in your policy's prospectus ... [b]eginning on [October 9th, 2003], we will no longer accept any trades via facsimile, phone or internet in Pioneer funds sub accounts. All trades or fund transfers regarding Pioneer Funds will have to be submitted by U.S. mail ... Please be aware that excessive fund trading in any other fund will result in our requiring that all fund transfers regarding these contracts be submitted via U.S. mail only. This restriction will facilitate a more normal level of transfer activity for these contracts (such as monthly or quarterly).

JA I at 568a. The Pruskys immediately responded in objection:

[It is our] position that, should ING not honor our fax exchanges, we believe they are violating our contracts, and we will hold ING liable for any losses or foregone gains. *Should that be the case, please move all of our policies so they are allocated 100% in money market* ...

... [W]e will continue to fax exchanges daily, basing each day's decision on the presumption we had the sub-account allocation stated in our previous (to that day) fax ...

Under the conditions outlined, we are moving to money market and will remain in money market so as to mitigate

our damages while minimizing risk; were we to be invested in a sub-account that declined in value, our policy value would decrease accordingly. If ING would rather we take a different approach to mitigating our damages while minimizing risk, please inform us of any such procedure immediately.

JA I at 570a (October 9, 2003 letter to ING) (emphasis in original).

Notwithstanding the ING letter, the Pruskys continued to trade in non-Pioneer mutual funds via fax. Less than a month later, ING again wrote to Plaintiffs and stated that going forward, *all* of their sub-account trades would have to be submitted via U.S. mail. The Pruskys again objected, and continued to send daily hypothetical trades via fax. ReliaStar placed the balance of all policies in money market accounts as directed.

A week later, the Pruskys initiated a breach of contract action against ReliaStar, seeking legal and equitable remedies ("First Action"). ReliaStar defended by arguing, *inter alia*, that (1) the late trading clause of the Sierk Memos was illegal, unseverable, and rendered the contracts void in their entireties; (2) increased regulatory scrutiny of frequent mutual fund trading constituted changed circumstances and rendered the market timing provisions impracticable; and (3) the market timing provisions, although not illegal, were unenforceable on public policy grounds. The Pruskys moved for partial summary judgment on liability, but the District Court *sua sponte* granted judgment in favor of ReliaStar, finding the late trading argument dispositive. *Prusky v. Reliastar Life Ins. Co.*, 2004 WL 2827049 (E.D.Pa. Dec.7, 2004) (Hutton, J.). A prior panel of this Court reversed, concluding (1) the illegal late trading clauses were severable; (2) the record did not establish impracticability; and (3) the market timing provisions did not violate public policy. *Prusky v. ReliaStar Life Ins. Co.*, 445 F.3d 695 (3d Cir.2006).

On remand, after some additional discovery[3], the Pruskys once again moved for summary judgment, seeking damages, declaratory relief, and an order of specific performance. The District Court granted summary judgment for Plaintiffs on the issue of liability, and specifically ordered ReliaStar to resume accepting electronic trades "so long as those transfers are not explicitly barred by a specific condition imposed by the fund in which a sub-account is invested." *Prusky v. ReliaStar Life Ins. Co.*, 474 F.Supp.2d 695, 702 (E.D.Pa.2007) (Dalzell, J.) ("*Prusky I*"). No appeal was taken from this decision.

Concluding that questions of fact precluded summary judgment on damages, the District Court ordered a hearing. Following a one-day damages trial, the District Court concluded the Pruskys failed to reasonably mitigate their damages and reduced damages accordingly. *See Prusky v. ReliaStar Life Ins. Co.*, 474 F.Supp.2d 703 (E.D.Pa.2007) ("*Prusky II*"). Plaintiffs timely appealed from the damages award.[4]

---

**3.** Of particular concern to the parties was the then-recent promulgation of a SEC rule which imposed restrictions on the ability of mutual funds to allow redemptions in the cases of short-term fund trades, *see* 27 C.F.R. § 270.22c–2(a)(1), and which may have required financial intermediaries like ReliaStar to agree to prohibit the execution of short-term trades by individuals whom the funds identified as violators of market timing policies, § 270.22c–2(a)(2).

**4.** ReliaStar initially had also appealed from the damages determination, but has subsequently withdrawn its appeal; it now only seeks an affirmance of the damages award. Appellee's Brief I, at 28 n. 9.

The Pruskys resumed their trading activities with the entry of the District Court's January 2007 Order, and ReliaStar accepted and processed the requested transfers without incident, for a short period, at least. On February 15 and March 30, 2007, ReliaStar notified Plaintiffs that Fidelity and ING mutual funds, respectively, had restricted their trades, thereby eliminating 57 of the 63 total sub-accounts available for investment. Then, on April 2, 2007, ReliaStar relayed that American Funds had also restricted the Pruskys' trades, the result being that Plaintiffs' choice of mutual fund investments was whittled to one.

Two days later, Plaintiffs filed another breach of contract action against ReliaStar ("Second Action"). ReliaStar moved for summary judgment, and the District Court entered judgment for ReliaStar. *See Prusky v. ReliaStar Life Ins. Co.*, 502 F.Supp.2d 422 (E.D.Pa.2007) (*"Prusky III"*). The Pruskys timely appealed.

## II. DISCUSSION

The District Court exercised jurisdiction over the instant diversity actions pursuant to 28 U.S.C. § 1332. We have jurisdiction

over the two pending appeals as they were timely taken from the final damages award in the First Action, and from the grant of summary judgment in the Second Action. 28 U.S.C. § 1291.

### A. Damages Award (First Action)

 The District Court's determination that the Pruskys did not adequately mitigate losses and that reasonable efforts would have reduced their damages are findings of fact reviewed for clear error. *See, e.g., Windsor Sec., Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655, 668 (3d Cir. 1993) (district court's conclusion that plaintiff could have done more to mitigate damages without incurring undue risk and expense were "not clearly erroneous"); 24 Richard A. Lord, WILLISTON ON CONTRACTS § 64:27, at 195 (4th ed. 1999) ("What is a reasonable effort to avoid the injurious consequences of a breach is a question of fact. So, too, is what is undue risk and expense.") (internal citations omitted); *Ram Constr. Co., Inc. v. Am. States Ins. Co.*, 749 F.2d 1049, 1053 (3d Cir.1984) (factual issues reviewed for clear error).[5] This is a *highly deferential standard of review.* Factual findings are clearly erro-

---

**5.** The Pruskys cite to two Third Circuit cases for the proposition that "review of a district court's decision involving the interpretation of state law, including the issue of mitigation of damages, is plenary." Appellants' Brief I, at 18 (citing *Dillinger v. Caterpillar, Inc.*, 959 F.2d 430, 434–35 (3d Cir.1992) and *Fiat Motors of N. Am., Inc. v. Mellon Bank, N.A.*, 827 F.2d 924, 930 (3d Cir.1987)). However, neither of these cases lends support for their contention. *Dillinger* is entirely inapposite authority for the instant case because the issue there pertained to the admissibility of certain evidence in a products liability trial for purposes of establishing mitigation. 959 F.2d at 434–35 ("The propriety of the district court's admission of evidence concerning Dillinger's non-use of the available seat belt to mitigate his damages is a question of Pennsylvania law. Accordingly, our review is plena-

ry.") (internal footnote omitted). On the other hand, *Fiat Motors* merely reviewed the trial court's determination of whether mitigation was warranted at all; since that question turned on state contract law principles, plenary review was thus clearly appropriate. 827 F.2d at 930–31 (finding no duty to mitigate).

In this case, neither side disputes that Plaintiffs were required to mitigate their damages. The only disagreements relate to whether the Pruskys' actual efforts were reasonable under the circumstances, and whether they could have, without undue risk and expense, undertaken other measures to minimize economic loss. These are precisely the findings that we have reviewed for clear error on a prior occasion. *See Windsor Sec., Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655, 668 (3d Cir.1993).

neous only where the appellate court is "left with the definite and firm conviction that a mistake has been committed." *Frett–Smith v. Vanterpool,* 511 F.3d 396, 399 (3d Cir.2008). It is not enough that we would have reached a different conclusion as the trier of fact; as long as the district court's factual findings are "plausible" when viewed in light of the entirety of the record, we must affirm. *Brisbin v. Superior Valve Co.,* 398 F.3d 279, 285 (3d Cir.2005) (quoting *Anderson v. City of Bessemer,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)).

The District Court concluded that ReliaStar breached its contractual obligations when it refused to process the Pruskys' faxed trade requests. The parties do not take issue with this liability determination, nor do they dispute that ReliaStar's breach resulted in $1,019,293.28 of foregone gains to Plaintiffs.[6] The sole questions before us are: (1) whether, in light of ReliaStar's breach, the Pruskys undertook reasonable efforts to mitigate damages; and if not, (2) the extent to which their recovery should be reduced. On these points, the District Court found the Pruskys: (1) did not act reasonably to mitigate by placing and

keeping their entire cash balance in a money market fund for more than three years; and (2) a reasonable alternative mitigation strategy would have decreased their losses by $912,000. Accordingly, the Court awarded the Pruskys damages of $107,293.28 ($1,019,293.28–$912,000).

This is a close case with a unique set of facts. After much careful consideration, however, we conclude that the District Court's findings on mitigation were not clearly erroneous. Therefore, we will affirm the damages award.[7]

### 1. *Reasonableness of the Pruskys' mitigation efforts*

 Mitigation is an affirmative defense, for which the breaching party bears the burden of proof. *Koppers Co., Inc. v. Aetna Cas. & Sur. Co.,* 98 F.3d 1440, 1448 (3d Cir.1996); *Williams v. Masters, Mates & Pilots of Am.,* 384 Pa. 413, 120 A.2d 896, 901 (1956). To prove a failure to mitigate, one must show: "(1) what reasonable actions the plaintiff ought to have taken, (2) that those actions would have reduced the damages, and (3) the amount by which the

**6.** This figure was calculated by taking the difference between the hypothetical cash value of the insurance policies had ReliaStar carried out the Pruskys' trades as they were required to under the contracts ("no-breach balance"), and the policies' actual cash value ("100% money market balance") as of January 31, 2007.

**7.** As the District Court noted, there is an unavoidable imprecision in the final damages calculation because the values each party proffered for the account balances were from different dates. In particular, the figure the parties stipulated to as the foregone gains, *see supra* n. 6, was as of January 31, 2007; whereas the figures provided by ReliaStar's expert witness were as of January 12, 2007 and were rounded to the nearest $1,000. *Prusky v. ReliaStar Life Ins. Co.,* 474 F.Supp.2d 703, 707 n. 9 (E.D.Pa.2007). The District Court calculated damages by taking

the difference between the no-breach and 100% money market balances on January 31, 2007, and subtracting from that, the difference between the third alternative strategy and 100% money market balances as of January 12, 2007. *Id.* at 707, 711–12. But, it may have been simpler (and potentially more precise) to have just awarded damages of $148,000 since, as of January 12, 2007, ReliaStar's data showed that its third proposed alternative would have underperformed the Pruskys' desired trades by $148,000. JA I at 1000a. Nevertheless, because the District Court's general methodology (i.e., no-breach losses less what reasonable mitigation would have produced) was correct, we cannot say that the imprecision in the calculation resulting from the use of the parties' temporally discordant figures arose to a clearly erroneous damages award.

damages would have been reduced." *Koppers*, 98 F.3d at 1448. Damages that could have been "avoided with reasonable effort without undue risk, expense, burden, or humiliation will be considered ... as not being chargeable against the defendant." WILLISTON ON CONTRACTS § 64:27, at 195. Reasonableness "is to be determined from all the facts and circumstances of each case, and must be judged in the light of one viewing the situation at the time the problem was presented." *In re Kellett Aircraft Corp.*, 186 F.2d 197, 198 (3d Cir. 1950).

When a party breaches a contract by failing to perform, the injured party should make reasonable efforts to avoid loss by arranging a substitute transaction. RESTATEMENT (SECOND) OF CONTRACTS § 350 cmt. b, at 127 (1981). Where no well-established market for the particular type of performance is available, the breaching party generally bears the burden "to show that a substitute transaction was available." *Id.* § 350 cmt. c, at 128. "Whether an available alternative transaction is a suitable substitute depends on all the circumstances, including the similarity of the performance." *Id.* § 350 cmt. e, at 130.

The issue here is whether the Pruskys, when they became unable to trade via fax on a daily basis, were required to do more than simply placing their $7 million balance in a money market fund for the three-year pendency of the litigation. Plaintiffs argue that because their only area of niche expertise is market-timing, forcing them to engage in any sort of a buy-and-hold strategy in the alternative would have required them to undertake undue risk. ReliaStar responds that keeping the entire balance idle in a low-yield, no-risk vehicle was not a reasonable substitute for the risky market-timing strategy in which the Pruskys were engaged prior to the breach.

ReliaStar cites to *Teachers Insurance and Annuity Association of America v. Ormesa Geothermal*, 791 F.Supp. 401 (S.D.N.Y.1991) for the proposition that a reasonable substitute must be one with a similar risk-reward profile to that of the opportunity lost as a result of the breach. In *Ormesa Geothermal*, a lender sued a prospective borrower who reneged on a commitment to borrow $25 million. There, the court held that the injured lender was entitled to damages as measured between the interest income it would have earned under the breached agreement and that it "would be deemed to have earned by timely mitigating its damages—i.e., by making an investment with similar characteristics at the time of the breach." *Id.* at 416. The court emphasized that in the mitigation context, an alternate investment "should have investment characteristics as close as possible to the original investment" in terms of principal, interest rate, borrower credit rating, and intended duration. *Id.* at 416; *see also Teachers Ins. & Annuity Ass'n of Am. v. Coaxial Communications of Cent. Ohio, Inc.*, 799 F.Supp. 16, 18–19 (S.D.N.Y.1992) (following *Ormesa Geothermal*).

■ What constitutes a reasonable substitute for mitigation purposes in the context of the breach of an investment contract is largely an issue of first impression for us. However, careful study of analogous authorities leads us to conclude that the view espoused by the *Ormesa Geothermal* court—that courts should consider the specific nature and characteristics of the performance· lost as a result of the breach in determining whether a proposed substitute was in fact reasonable—is a well-reasoned one.

While there is admittedly a dearth of authorities on the precise issue at hand, we find the Seventh Circuit's decision in *Fishman v. Estate of Wirtz*, 807 F.2d 520 (7th

Cir.1986) to be particularly helpful. In *Fishman,* an unsuccessful bidder for the Chicago Bulls claimed that the actual purchaser violated antitrust laws in acquiring the franchise. Finding liability, the district court calculated damages by subtracting from the undisputed antitrust damages a figure representing plaintiff's "opportunity cost," an amount which the court equated to what plaintiff would have earned had he placed the idle capital in three-month treasury bills during the ten-year pendency of the dispute. *Id.* at 556. The Seventh Circuit upheld this methodology in principle; but, defining "opportunity cost" as "the return on the most lucrative alternative investment, that is, the return on the 'next-best' investment," *id.* at 556, the panel reversed on the grounds that a three-month treasury rate of return was not the "next-best" alternative to the particular equity investment at issue, *id.* at 558–59.

Applying "opportunity cost" principles to the mitigation context, the *Fishman* court held that the proper alternative investment would be one yielding a similar return as might be expected for *equity* investments, "albeit not necessarily the highest and riskiest one available." *Id.* at 559.[8] In particular, the court reasoned:

> On the one hand, we agree with the district court that while a plaintiff has a duty to mitigate damages, he should not be required to take undue risks. On the other hand, we cannot adopt a measure of opportunity cost which would reward a plaintiff for letting his capital lie fallow while he waited passively for many years to collect his [ ] damage[s] award. While, as we have noted, an investor of risk capital may have no duty of "cover"

in the same sense as a commodity trader's duty, the loss of one investment opportunity does not negate the assumption that the capital will seek out some comparable opportunity.

*Id.* at 558 (internal citation omitted).

The Seventh Circuit remanded for the district court to reconsider the question of the appropriate opportunity cost. *Id.* at 559. In doing so, however, the court did not preclude the use of the treasury rate altogether; it merely opined that it was unreasonable to use the T-bills rate for the entire ten-year damages period. *Id.* at 559–60 ("while undue risk may not be forced on a victim of wrongdoing, leaving equity funds *indefinitely* in treasury bills could discourage enterprise and would not be a proper assumption for the computation of the opportunity cost of equity in the long run") (emphasis added). Indeed, the court expressly acknowledged that given the nature and complexity of the particular lost investment opportunity at issue, it may have been entirely reasonable to place the unused funds in treasuries for some initial period of time while plaintiffs sought out and structured alternative investments. *Id.* at 559.

Similarly, the Court of Federal Claims' mitigation decision in *Koby v. United States,* 53 Fed.Cl. 493 (2002), a breach of contract case, also lends support to the *Ormesa Geothermal* view. In *Koby,* plaintiff purchased an apartment building at an Internal Revenue Service ("IRS") auction, but the IRS unilaterally rescinded the sales agreement and subsequently put the property up for auction again. There, the court rejected the IRS's argument that plaintiff's failure to participate in the second auction constituted a failure to miti-

---

**8.** The relevant distinction is of course that equity investments entail more risk and thus offer a commensurately greater rate of return than that which one would expect from a lower-risk debt investment. Because treasury bills are the prototypical example of a risk-free investment, their yields are also correspondingly low.

gate because "[t]he latter transaction [ ] did not involve remotely the same type of performance owed under the prior contract." *Id.* at 498. In particular, the court found: the second auction was merely an open-ended offer of sale to the public, whereas plaintiff previously had a contract to buy at a fixed price; the second auction's minimum sales price was nearly four times the original minimum; and the second auction's owner redemption period would have occurred at a time when real estate prices were increasing, thereby increasing the likelihood of redemption. *Id.* at 498 n. 4.

■ These cases are persuasive support for the District Court's conclusion that the Pruskys did not adequately and reasonably mitigate their damages.[9] In particular, the District Court found as follows: "The Pruskys had previously invested [the insurance policy] funds in vehicles with substantial exposure to the equity markets and had produced double-digit returns", whereas money market funds have "often underperformed inflation." *Prusky II,* 474 F.Supp.2d at 709. These findings are supported by the record. *See* JA I at 283a–284a (Steven Prusky's testimony that market-timing is not without risk). Thus, prior to ReliaStar's breach, the Pruskys were clearly engaged in an active investment strategy that entailed a degree of risk, but one which commensurately had historically yielded handsome returns. As such, the passive, post-breach allocation of Plaintiffs' funds to a risk-free, low-return money market fund is decidedly not a *comparable* alternative investment opportunity. The District Court's finding on this point is not clearly erroneous.

The Pruskys implicitly contend that because their market-timing strategy is so unique, no comparable investment opportunities exist for them. While this argument admittedly has some intuitive appeal, we nevertheless fear that its wholesale adoption would leave us teetering on the edge of the proverbial slippery slope. Our

---

**9.** Plaintiffs rely on *Scully v. US WATS, Inc.* for their argument that mitigation principles did not require them to reenter the market to make substitute investments. 238 F.3d 497 (3d Cir.2001). However, *Scully* is readily distinguishable. At issue in *Scully* was the proper calculation of damages for an employee who was wrongfully prevented from exercising certain stock options. There, the district court used a blend of conversion and breach of contract principles, and calculated damages by multiplying the number of options by the difference between the options' strike price and the stock's open market price on the date of the employee's attempted exercise. *Id.* at 508. The employer objected that because the options required the employee to hold the purchased shares for at least one year after the date of exercise, the court should have discounted the open market price to account for the restricted nature of the shares, and plaintiff should not be able to recover *"beyond that computed using the discount unless he actually covered by entering the market to mitigate his losses." Id.* at 514 (emphasis added).

The court rejected the idea that plaintiff was required to actually purchase the stocks as a "cover" in a case involving lost stock options; instead, it stated that in the conversion context, the "cover/mitigation principle ... is merely a method of establishing 'the outer time limit of a reasonable period during which the highest intermediate value of the lost stock can be ascertained.'" *Id.* (quoting *Schultz v. Commodity Futures Trading Comm'n,* 716 F.2d 136, 140 (2d Cir.1983) (wrongful stock *conversion* case)). Furthermore, the *Scully* court concluded that the proposed "cover" was inappropriate because it would have required plaintiff to risk substantially more money in the market in order to obtain the same potential profit than he would have had to by exercising the options (i.e., to get 100 shares through options, plaintiff only had to pay the strike price times 100, whereas to "cover" the same 100 shares on the open market, plaintiff would have had to pay the higher open market price times 100). *Id.*

concern with the Pruskys' position is that under it, few, if any, injured investors will have to mitigate damages because nearly all investment opportunities are unique in some aspects. Not surprisingly, we are not alone in our concern, as other courts have also declined such arguments and require mitigation regardless of the particular lost opportunity at issue. *See, e.g., Fishman*, 807 F.2d at 559 (unsuccessful purchaser of Chicago Bulls was expected to seek out alternative equity investment); *McGrath v. McGrath*, No. 0202753H, 2007 WL 738697, *5–*8 (Mass.Super.Ct. Feb. 12, 2007) (rejecting argument that no substitute existed when defendants were forced out of an ownership stake in an apartment complex; acknowledging that investment in real estate mutual funds or REITs could have been reasonable alternatives). We see no reason to depart from this well-trodden path.

Certainly, investing in mutual funds entails a degree of risk, and it would likely be improper to force such investments upon laypersons if their prior investments were exclusively in low- to no-risk vehicles like certificates of deposits or treasuries. But that was not the case with the Pruskys. Paul and Steven Prusky had a long track record—indeed, over three decades worth, combined—as successful money managers. *See Ormesa Geothermal*, 791 F.Supp. at 417 ("although it may not be appropriate to force unsophisticated individuals to assume risks in investing monetary rewards, those same concerns do not apply to sophisticated investors"). Thus, their por-

trayal of themselves as entirely clueless about general equity and bond mutual fund investments once taken out of their market-timing niche strains credulity.

Furthermore, it bears noting that ReliaStar's breach only prevented the Pruskys from trading by electronic means; they were expressly permitted to engage in frequent trading as long as the trades were submitted by U.S. mail.[10] Nothing in the record supports the Pruskys' implicit suggestion that they would have been required to blindly pick at various "volatile" equity and bond funds and sit idly by in the face of significant fund declines. On the contrary, they possessed the ability to modify their allocations as necessary, albeit with a day or more lag.[11] Considered alongside the well-known fact, which Steven Prusky himself acknowledged at trial, *see* JA I at 280a, that mutual fund investments by their very nature are less likely to be susceptible to dramatic changes in value on a day-to-day basis relative to direct individual equity investments, it is clear that Plaintiffs' suggested doomsday scenario—that their fund values would decline so significantly as to cause the policies to lapse—was but a remote possibility.

■ Moreover, as the Seventh Circuit indicated, the duration of the mitigation period is also an important consideration in the reasonableness inquiry. *See Fishman*, 807 F.2d at 559 (unreasonable to place funds that would have been used for an equity investment in no-risk treasuries

10. Notwithstanding the plain language of the ING letters that trades by U.S. mail would be accepted, Plaintiffs suggest ReliaStar would not have processed the trades more frequently than monthly or quarterly. However, there is no evidence that this would have been the case; the Pruskys never attempted to submit any trades by U.S. mail.

11. Additionally, we note that although much emphasis is placed on the ability to place daily trades, Plaintiffs did not historically trade in and out of all of their desired funds with such frequency. Steven Prusky's testimony indicated that while their equity holdings were generally of a very short duration (a day to a few days), their bond positions sometimes had longer hold horizons (a week). JA I at 232a; 282a–283a.

for ten years). Here, the District Court found that notwithstanding Steven Prusky's testimony that he had hoped the dispute with ReliaStar would be resolved in a matter of weeks, no reasonable person, especially not one assisted by "able and seasoned counsel," could have harbored such illusions about the nature of federal litigation. *Prusky II*, 474 F.Supp.2d at 709 n. 14. This is a sensible conclusion, especially in light of the fact that the Pruskys are clearly no strangers to litigating in the federal courts. *See, e.g., Windsor Sec., Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655 (3d Cir.1993) (plaintiff Paul Prusky alleged insurer's transfer restrictions constituted breach of contract); *Prusky v. Aetna Life Ins. & Annuity Co.*, 2006 WL 952320 (3d Cir. April 13, 2006) (plaintiffs Paul and Steven Prusky appealed in breach of contract action); *Prusky v. Prudential Ins. Co. of Am.*, 44 Fed.Appx. 545 (3d Cir.2002) (Paul Prusky sued for breach of contract). Indeed, even if Steven Prusky's belief was reasonable at the outset of the litigation, it would have become decidedly unreasonable as the case progressed on with no end in sight; at that point, Plaintiffs should have adjusted their mitigation strategy accordingly.

On the other hand, we acknowledge that the Pruskys' position is not without support. First, as a practical matter, had the breach period coincided with a widespread market decline, it is possible that any form of a buy-and-hold strategy would have underperformed money market returns. However, in such a case, as Defendant's counsel explicitly acknowledged during oral arguments, ReliaStar would also have been liable for the losses, so long as the investment strategy was, and continued to be, reasonable. *See* RESTATEMENT (SECOND) OF CONTRACTS § 350 cmt. h, at 132–33 (injured party who makes reasonable but unsuccessful efforts to avoid additional loss not precluded from recovery); *id.* § 347

cmt. c, at 114 (injured party may recover for incidental and consequential costs/damages incurred as a result of reasonable efforts at mitigation, even if efforts proved unsuccessful).

Second, that the Pruskys did have all of their money in money market funds for periods of time prior to the breach is some support that their actual mitigation strategy—100% allocation to money market—wasn't as incomparable to their desired strategy as ReliaStar suggests. However, using the trades the Pruskys requested during the breach period as a proxy, where on average only 44% of their money was in money market, *see* JA I at 28a, a 100% money market allocation would appear to be the exception rather than the rule. Furthermore, it obviously would have been impossible to even come close to achieving the double-digit returns to which Plaintiffs were accustomed with a pure money market allocation. Therefore, on the whole, it is hard to conceive of the two different strategies—one active and weighted towards equity and high yield, and the other passive and without any risk exposure—as comparable.

We recognize that the Pruskys were confronted with a difficult mitigation decision, and are not unsympathetic to their claim that the inability to execute immediate trades eroded much of their market expertise and advantage. Ultimately, however, the crux of this case turns on whether, putting aside any prospect of future legal recovery, an experienced investor would have been content to leave $7 million of capital entirely invested in money market for a multi-year, and potentially indefinite, period. We think the answer is a decided "no." In light of all the circumstances, we do not think it unreasonable, as the District Court concluded, to expect intelligent individuals like the Pruskys, indeed, individuals who *invest money for a*

*living,* to position their investments for higher returns than that which could have been expected from a certificate of deposit. On balance, the fixed money market allocation was not the "next-best" alternative to Plaintiffs' favored market-timing strategy. Accordingly, the District Court's conclusion that the Pruskys did not reasonably mitigate their damages was not clearly erroneous.

### 2. *Availability of other reasonable alternative methods of mitigation*

■■■■ A failure to mitigate, however, does not preclude wholesale recovery. Rather, in such a case, the defendant is merely entitled to offset his damages payment by the amount he can prove could have been avoided through plaintiff's reasonable efforts. *E.g., Koppers,* 98 F.3d at 1448; *State Pub. Sch. Bldg. Auth. v. W.M. Anderson Co.,* 49 Pa.Cmwlth. 420, 410 A.2d 1329, 1331 (1980). The reasonableness determination "must be judged in the light of one viewing the situation at the time the problem was presented." *Kellett Aircraft,* 186 F.2d at 198.

Here, ReliaStar offered three alternative mitigation strategies through the testimony of its expert witness, Dr. Vincent Warther. The first strategy proposed maintaining the Pruskys' portfolio exactly as it existed on November 5, 2003, the date ReliaStar breached the contracts by revoking their electronic trading privileges. Over the breach period, this hypothetical allocation would have outperformed Plaintiffs' desired trades by over $1.3 million.

The second proposal was more complex. Analyzing the desired trades, Dr. Warther determined that the Pruskys, on average and on an aggregate basis, had 44% of their money in money market over the three-year breach period. As such, he proposed a fixed distribution of 44% in money market, and 56% in mutual funds. The 56% would have duplicated the Pruskys' mutual fund portfolio as it existed on the date of the breach. This strategy would have yielded $264,000 more than did the desired trades.

The third proposal replicated a buy-and-hold allocation based on Plaintiffs' requested trades. In this scenario, Dr. Warther gathered all of the Pruskys' desired trades for the same three years following the breach and "held the funds in which the [Pruskys] invested in the same proportions and during the same time periods as the Pruskys' desired trades." [12] *Prusky II,* 474 F.Supp.2d at 711. This last proposal produced $148,000 less than Plaintiffs' desired trades would have, but outperformed the pure money market allocation by $912,000.

The District Court rejected the first strategy, reasoning that basing a long-term hold position on allocations Plaintiffs just happened to have held on a particular day was "arbitrary at best." *Id.* Insofar as the second strategy was also partly premised on holding the portfolio fixed based on the Pruskys' particular alloca-

---

12. As Dr. Warther further elaborated at trial: Dr. Warther: The third strategy ... invests in exactly the same funds at the same time in the same proportion that the [Pruskys' desired] trading strategy was invested ... It holds [the funds] as long as the [Pruskys were] holding them. So, if [the Pruskys] invested in a given fund for a 12 month period, this [strategy] also invests in a 12 month[ ] period.

The Court: Even though in the [Pruskys'] trading it was moving in and out? Dr. Warther: Exactly. What it does, it takes the average dollar balance that the [Pruskys] had over that period and smooths it out and so it does it in a buy and hold way.
JA I at 360a–361a.

tions on the date of the breach, the Court found it to be similarly unreasonable. We cannot say that these conclusions were clearly erroneous; it is certainly plausible that a reasonable investor in the Pruskys' position would not have considered such a random portfolio allocation to be a sound long-term investment strategy.

] However, the District Court concluded the third proposed strategy "represent[ed] a reasonable mitigation strategy that was readily available to the Pruskys." *Id.* at 711–12. To the extent that this method was derived through an after-the-fact tabulation of the desired trades during the breach period, we recognize that it may seem somewhat counterintuitive to expect the Pruskys to be able to carry out this precise asset allocation without assuming some prescience on their part. Nevertheless, where, as here, the lost performance implicates foregone investment opportunities, and where mitigation efforts could have consisted of any of countless permutations of investments held for varying durations, we think that any legitimate attempt to demonstrate a mitigation offset will invariably entail some degree of *ex-post* reasoning. As such, insofar as this strategy attempted to mimic the risk profile underlying the desired allocations, made buy-and-hold investments in the same funds the Pruskys would have bought absent the breach, and was active in its management of the portfolio, we are satisfied there was no clear error in the District Court's conclusion that the strategy was one that was both reasonable and readily available to the Pruskys.

Finally, we wish to conclude with the observation that for purposes of clear error review, it is irrelevant that we may not view this strategy to be *the most* reasonable or *the most* persuasive one, or even if we feel that we would have made entirely different findings on the mitigation ques-

tion had we been sitting as the original triers of fact. Here, we must uphold the trial court's findings on the availability of alternative mitigation strategies, and on the amount of the mitigation offset, simply because they are not, in light of the whole record, implausible. Therefore, we will affirm the judgment for the Pruskys in the amount of $107,293.28.

### B. Summary Judgment (Second Action)

In the Second Action, the District Court granted summary judgment for ReliaStar. The Pruskys contend this was error, arguing that neither issue nor claim preclusion bars their second lawsuit, and that the District Court erred in interpreting the contracts. Because we conclude that the application of collateral estoppel here is dispositive, we need not consider the *res judicata* or contract construction questions, and will affirm solely on issue preclusion grounds.

] We exercise plenary review over a grant of summary judgment. *Doe v. Abington Friends Sch.,* 480 F.3d 252, 256 (3d Cir.2007). Likewise, we review *de novo* a trial court's application of collateral estoppel. *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.,* 458 F.3d 244, 249 (3d Cir.2006). There is no dispute that Pennsylvania preclusion law governs in this diversity action. *Riverside Mem. Mausoleum, Inc. v. UMET Trust,* 581 F.2d 62, 66 (3d Cir.1978).

 In Pennsylvania, application of collateral estoppel requires (1) identity of issues, (2) a final judgment on the merits, (3) identity of parties, (4) that the party seeking relitigation had a full and fair opportunity to argue the issue in the prior proceeding, and (5) that the prior determination was essential to the judgment. *E.g., Yamulla Trucking & Excavating Co.,*

*Inc. v. Justofin,* 771 A.2d 782, 786 (Pa.Super.2001). Only the first and fifth elements are disputed here.

The Pruskys' first argument that there is no identity of issues is easily dispatched. Initially, it is simply not the case that the First Action concerned the parties' obligations under the insurance *prospectus*, whereas the Second Action turned on the terms of the insurance *contracts.* In *Prusky I,* the District Court cited to a contract term that "[a]ll transfers are also subject to any charges and conditions imposed by the Fund whose shares are involved," and opined based on this term that "the contract allows ReliaStar to condition its performance on compliance with [a fund's instructions to prohibit or restrict trading.]" *Prusky I,* 474 F.Supp.2d at 700. As a factual matter, this same language appears in both the policies' prospectuses and the insurance contracts themselves. Therefore, it is irrelevant that the District Court cited the prospectus as the source of the particular contractual term in *Prusky I,* because there is no reason why this identical language should be susceptible to a different construction in a subsequent action involving the same contracts and parties.

Nor do we agree with the Pruskys' overly-narrow characterization of the particular legal questions at issue in the two proceedings. That the two actions were precipitated by distinct factual developments, i.e., ReliaStar's refusal to allow electronic trades versus its subsequent refusal to accept all trades, does not detract from the fact that the same legal issue— the extent of ReliaStar's contractual obligations under the insurance contracts— was nevertheless at the heart of both actions.

Furthermore, the Pruskys' second point of contention—that the District Court's prior determinations were not "essential to the judgment"—is also unavailing. The Pruskys argue that the District Court never made any binding determination in the First Action as to the extent of ReliaStar's obligation to accept trades in the event that the mutual funds actually restricted their trades. They claim that because the sole issue in dispute in the First Action was their right to execute trades through electronic means, the District Court's "comments" as to ReliaStar's performance obligations beyond this narrow issue were merely advisory in nature, and thus could not have been appealed. Plaintiffs are incorrect.

It is true that only legal or factual conclusions necessary to a final valid judgment may be given preclusive effect. Restatement (Second) of Judgments § 27, at 250 (1982). This necessity requirement is justified by concerns that the first court "may not have taken sufficient care in determining an issue that did not affect the result" and that "appellate review may not be available to ensure the quality of the initial decision." 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 4421, at 539 (2d ed.2002).

Here, the gist of Plaintiffs' claims in the First Action was that ReliaStar's refusal to accept faxed trades constituted breach of contract. However, because ReliaStar defended by arguing, *inter alia,* that the mutual funds' reluctance to process the trades rendered its performance impracticable, the parties in fact vigorously litigated the impact of fund restrictions on ReliaStar's contractual obligations.[13]

---

**13.** In particular, as indicated by the Pruskys' trial court submissions, they argued below that even if the mutual funds restricted their

trades, ReliaStar was obligated to take reasonable efforts to overcome such restrictions, by, *inter alia,* negotiating with the funds to

The District Court found that ReliaStar was in breach because it did not "demonstrate ... that it ever received any instructions [from any mutual funds] to restrict the [Pruskys'] trading." *Prusky I,* 474 F.Supp.2d at 700. However, the Court was explicit that "when ReliaStar has received specific instructions from a fund to prohibit or restrict trading, the contract allows ReliaStar to condition its performance on compliance with those instructions." *Id.*

Had the Pruskys simply sued for legal damages in the First Action, they would be correct that this latter finding would not have been essential to the Court's ultimate judgment that ReliaStar had breached the contract. But the problem is that Plaintiffs sought damages as well as "injunctive, declaratory, and/or specific-performance relief." JA I at 67a (Compl., ¶ 88). In particular, they asked the District Court to order ReliaStar "to perform specifically its obligation under the Contracts to accept and effect sub-account transfer instructions communicated ... by fax, telephone, or other electronic means," and *"to undertake reasonable efforts to surmount any future obstacles to performance of its obligations under the Contracts."* Pls.' Proposed Order, ¶ 4 (emphasis added).[14] This requested relief necessitated a determination as to whether ReliaStar was contractually obligated to make reasonable efforts to continue to perform once the trades were refused by the mutual funds. That the funds had not actually restricted any trades at the time the District Court granted injunctive relief does not render its decision advisory; on the contrary, the legal impact of the restrictions was essential to the question of the scope of the Pruskys' entitlement to relief.

Nor are Plaintiffs correct that they could not have appealed from the decision merely because the District Court entered judgment in their favor on the liability issue. Indeed, since they asked for, but did not receive, an order compelling ReliaStar to perform even in the face of actual fund resistence, the Pruskys had standing to appeal. *Cf. Watson v. City of Newark,* 746 F.2d 1008, 1010 (3d Cir.1984) ("a party who receives *all* of the relief which he sought is not aggrieved by the judgment affording the relief and cannot appeal from it") (emphasis added); *N.Y. Tel. Co. v. Maltbie,* 291 U.S. 645, 646, 54 S.Ct. 443, 78 L.Ed. 1041 (1934) (phone company that obtained *unqualified* and *permanent* injunction against collection of rates did not have standing to appeal the court's conclusions as to the rates that would have been collected under the enjoined practice). That Plaintiffs failed to do so in error does not mitigate the preclusive effect of that prior binding determination.

In sum, the Pruskys are collaterally estopped from relitigating the question of the scope of ReliaStar's contractual obligations. ReliaStar was thus entitled to the entry of judgment in its favor.

## III. CONCLUSION

Upon careful consideration, we find no clear error in the District Court's conclusions that the Pruskys did not adequately mitigate their damages and that reasonable efforts would have reduced losses by $912,000. Additionally, the District Court did not err in granting summary judgment

---

allow for market-timing, subscribing to new funds that permitted market-timing, and adjusting the cash value of the Pruskys' policies as if the restricted trades had been made. *See* Pls.' Mot. for Summ. J., at 17–21 (Doc. No. 69, No. 03–CV–6196).

**14.** This proposed order was submitted to the District Court in conjunction with Plaintiffs' Motion for Summary Judgment in the First Action. *See supra* n. 13.

for ReliaStar in the Second Action on issue preclusion grounds. Therefore, we will affirm the judgments of the District Court.

HARDIMAN, Circuit Judge, concurring.

I agree with the result reached by the majority in all respects. I write separately to opine that the District Court's finding that the Pruskys did not reasonably mitigate their damages should be affirmed only because of our deferential standard of review.

### I.

The parties vigorously dispute the standard of review applicable to the mitigation issue.[15] The Pruskys argue for plenary review while ReliaStar asserts that the reasonableness of mitigation efforts is a factual determination that we must review for clear error. Like the majority, I believe ReliaStar's position is more persuasive, especially in light of our decision in *Windsor Securities, Inc. v. Hartford Life Insurance Co.*, 986 F.2d 655, 668 (3d Cir. 1993), where we applied the clear error standard in affirming the district court's finding that an investor failed to mitigate his damages. *Id.* at 657–58. Under this deferential standard of review, we may not overturn the District Court's "plausible" findings of fact even if we are "convinced that had [we] been sitting as the trier of fact, [we] would have weighed the evidence differently." *Brisbin v. Superior Valve Co.*, 398 F.3d 279, 285 (3d Cir.2005) (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)).

Had I been sitting as the trier of fact in this case, I probably would have found that the Pruskys pursued a reasonable mitigation strategy. In the typical case, an aggrieved investor acts reasonably when he places his investment into a low-risk interest-bearing account. In light of the "unique set of facts" of this case, Maj. Op. § II.A, however, I cannot say that the District Court's contrary conclusion was implausible or clearly erroneous. Accordingly, I disagree with the majority only insofar as it suggests that had we evaluated the Pruskys' actions *de novo*, we would have found them unreasonable. The majority makes this suggestion in two ways.

First, the majority faults the Pruskys for failing to adopt the "next-best" investment alternative to their favored market-timing strategy. Maj. Op. § II.A.1; *see also id.* (adopting *Ormesa Geothermal* rule that alternative investment should be "as close as possible to the original investment" and citing with approval the *Fishman* rule that substitute investment must be the "most lucrative" alternative). The duty to mitigate, which falls upon the *non-breaching* party, is not so onerous and does not so narrowly limit the options available to aggrieved investors. It requires merely "reasonable" conduct, not conduct that is "next-best," "as close as possible," or "most lucrative." *See In Re Kellett Aircraft Corp.*, 186 F.2d 197, 198–99 (3d Cir.1950) ("The rule of mitigation of damages may not be invoked ... merely for the purpose of showing that the injured person might have taken steps which seemed *wiser* or would have been *more advantageous* to the defaulter.") (emphasis added).

Second, the majority deviates from our rule that reasonableness must be determined from the perspective of the non-breaching party at the time of the breach. *Kellett*, 186 F.2d at 198. Contrary to the

---

**15.** *See* Br. of Appellant 18, 30, 37; Br. of Appellee 2, 9–12, 14–15, 19, 20 n. 6, 21–22, 24, 28; Reply Br. of Appellant 2–3.

majority's suggestion, Maj. Op. § II.A.1, a mitigation strategy that is initially reasonable does not become unreasonable because of subsequent events. Rather, subsequent events effect only the *amount of any "mitigation offset."* Maj. Op. § II.A.2 (emphasis added); *see also* Br. of Appellee 23 (noting that Dr. Warther's analysis was relevant to determining "by what amount, if any, to reduce [the Pruskys'] damages in connection with alternative strategies.").

For example, subsequent market events are relevant to determining the amount by which a non-breaching party's award will be reduced if a court first determines that the party failed to reasonably mitigate. *See, e.g.,* RESTATEMENT (2D)CONTRACTS § 350 cmt. f, illus. 16. Conversely, subsequent market events may render a non-breaching party's reasonable mitigation efforts unsuccessful, in which case, the breaching party will be liable for any additional loss incurred as a result of the non-breaching party's "reasonable but unsuccessful" efforts. RESTATEMENT (2D) CONTRACTS § 350(2), and cmt. h.

Evaluating the options available to the Pruskys at the point of ReliaStar's breach, *Kellett,* 186 F.2d at 198, the money market subaccount virtually guaranteed at least some profit and was therefore at least a reasonable choice. As it turned out, the bond and equity subaccounts outgained the money market subaccount from 2003–2007, but the opposite result could just as easily have obtained, as it did from 2000–2003. Were I considering these circumstances in the first instance, I would have been inclined to conclude that the Pruskys pursued a reasonable strategy that, in hindsight, proved to be less "lucrative" than the similarly reasonable strategies proffered by ReliaStar. On this basis, I likely would have concluded that the Pruskys satisfied their duty to mitigate. *Kellett,* 186 F.2d at 198 ("Where a choice has been required between two reasonable courses, the person whose wrong forced the choice can not complain that one rather than the other was chosen.").

Notwithstanding the foregoing observations, our standard of review requires that we defer to the District Court's "plausible" findings of fact regarding the Pruskys' mitigation efforts. *See Brisbin,* 398 F.3d at 285. For that reason, I concur in the result reached by the majority.